WATSON, Justice.
Defendant, Billy Ray Washington, was convicted by a ten to two jury verdict of the attempted aggravated rape of a six year old girl, Tashenna Ballard, on or about September 3, 1978. LSA-R.S. 14:27; 14:42. Washington was sentenced by the trial court to fifty years at hard labor, the statutory maximum for attempted aggravated rape. He has appealed his conviction and sentence, assigning fifteen errors by the trial court.
Washington was initially convicted as charged on four counts of attempted aggravated rape. The convictions were reversed because failure to sever the charges caused substantial prejudice to the defendant. State v. Washington, 386 So.2d 1368 (La., 1980). A grand jury then reindicted Washington, charging him with four counts of aggravated rape. The indictment on this charge was severed and amended to charge attempted aggravated rape.
FACTS
Tashenna, age nine at the time of this trial, testified that she had been playing with her sister Cassandra and climbing a tree. Defendant, identified in court, came into the yard, said he knew her daddy, and asked her to go to the store for a “pop”. (Tr. 418) Tashenna received her mother’s permission, because Mrs. Ballard assumed the man was one of her husband’s friends. Mr. Ballard had been napping, and the two were gone when he went outside to see who it was. When they arrived at the store, *644 Tashenna said “here’s ... where you can get your pop” (Tr. 419). At that time, defendant said he had a gun in his sock and told her to get on the back of his bike. She was scared and crying. He carried her inside a “raggedy” (Tr. 419) abandoned old house, and instructed her to lie down on the floor. After removing her panties, defendant put his penis in her private parts.[1] Defendant hurt her and “hunched” her. (Tr. 423) She continued to cry and was told to close her eyes. Defendant later carried her tó a street corner near her home.
Crying and “hollering” (Tr. 453), Tashen-na returned home. She had been gone about an hour. There was dirt and sheet-rock chalk on her clothes and body and what appeared to be sperm on her panties. There were no apparent tears in the skin. Tashenna took her father to the old house where the floors were covered with broken sheetrock. She described the offender as having braided hair and wearing a blue jogging jacket with orange stripes. She and her family rode around looking for him that day and afterward. Because of Tash-enna’s age and the lack of a suspect, her parents did not report the matter to the police.
About a week later, Mrs. Ballard saw a man fitting Tashenna’s description looking at a little girl in another yard. The suspect noticed her, threw a towel over his face, and started walking backwards. Without telling Tashenna their purpose, she, her husband and Tashenna drove toward the area in their car. When Tashenna pointed out Washington, her father jumped out of the car and started after him. The man ran away, and Mr. Ballard followed. The latter shot his gun, but did not hit Wash-. ington.
The police were notified. Mr. and Mrs. Ballard and Tashenna separately identified Washington in a photographic lineup.
When officers went to Washington’s residence with an arrest warrant, Washington tried to leave, first through a back window and then through the front hall. After his arrest, Washington was put in a physical lineup the same day, September 15, 1978. He was separately identified by Mr. and Mrs. Ballard and Tashenna.
Dr. Charles Nash testified that he saw Washington on September 15, 1978, and determined that Washington had nonsymto-matic gonorrhea. There was evidence that Tashenna showed symptoms of the disease shortly after her contact with Washington.
By coincidence, defendant was depicted in the photographic lineup wearing the jacket which Tashenna' described at trial. After conference with counsel, the trial court denied a mistrial but ordered that the jacket be covered if counsel desired. The jurors, therefore, saw an edited version of the photographic lineup with the clothes of the subjects covered.
ASSIGNMENT OF ERROR NUMBER ONE
Defendant contends that the charge against him should have been quashed because of prosecutorial vindictiveness.
It is argued that joining the four offenses together before the grand jury and charging Washington with aggravated rather than attempted aggravated rape constituted retaliation by the state for Washington’s successful appeal.
In a Shreveport newspaper article, Assistant District Attorney B. Woodrow Nesbitt, Jr., made a statement responding to the reversal of the four initial convictions. “In my view, on a single indictment, Washington would have been found not guilty.” (Tr. 26) Nesbitt was, of eourse, incorrect because Washington was convicted on this severed charge. His statement of excuse for the prosecutorial error in the first trial does not necessarily indicate that the join-der of offenses before the grand jury was malicious.
There was no statutory bar to combining the four charges against Washington in the same indictment. LSA-C.Cr.P. art. 493. Because the joinder was so prejudicial, the four charges could not be tried together. *645 State v. Washington, supra. Compare State v. Carter, 352 So.2d 607 (La.,1977). However, the prosecution corrected its error by severing this charge for trial. Defendant’s trial was not affected by the severance.
The state may not penalize a defendant for appealing his conviction. North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). Therefore, the state is prohibited from substituting a more serious charge for the original one in the absence of new evidence or other excuse. Blackledge v. Perry, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). Thus, the state could not have retried Washington with the same evidence on the greater charge of aggravated rape. However, the state correctly amended the grand jury’s indictment to charge the lesser attempted' offense of which Washington had been previously convicted. A presumption of prose-cutorial vindictiveness is not warranted. Compare United States v. Goodwin, - U.S. -, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982).
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER TWO
Defendant contends that the charge against him should have been quashed because the state failed to commence this trial within one year from the date a new trial was granted. LSA-C.Cr.P. art. 582.
The order granting a new trial in State v. Washington, supra, was final on September 12, 1980. The second trial was not commenced until December 7, 1981, more than a year later. However, the one year period of limitation is suspended during consideration of a defendant’s motion to quash or other preliminary plea. LSA-C.Cr.P. art. 580; State v. Falkins, 395 So.2d 740 (La.,1981); State v. Bullock, 311 So.2d 242 (La.,1975).
Defendant argues, correctly, that his motion to quash the indictment was caused by the state’s error in joining the offenses and indicting him on a greater charge. Therefore, this motion did not cause a suspension. However, defendant also filed a motion to suppress the use of prior uncounseled convictions for impeachment. This motion was filed on May 22, 1981, and an evidentiary hearing was held on June 16, 1981. The trial court declared the matter moot on August 18, 1981. Although the trial court’s oral reasons are not in the record, the parties agree that the matter was declared moot when the state announced it would not use those convictions for impeachment purposes. Thus, defendant benefited by the motion, which interrupted the one year prescriptive period.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER THREE
Defendant was confined with leg restraints during the trial and it is argued that this constituted error.
Defendant had attempted to escape. There was a reasonable apprehension that he might attempt another escape. In order to avoid prejudice in the collective mind of the jury, the trial court ordered that Washington enter the courtroom before the jury and leave afterward. Thus, the leg irons, described as a restraining device, were not obtrusive. There is no indication that the jurors were aware that Washington was under restraint and therefore no showing of prejudice. There was no abuse of discretion by the trial court. State v. Tennant, 262 La. 941, 265 So.2d 230 (1972). Compare State v. Wilkerson, 403 So.2d 652 (La.,1981).
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER FOUR
Defendant contends that the jury should have been sequestered to avoid prejudicial media coverage about the first trial, escape attempt and conviction reversals.
The trial court was not required to sequester the jury in this non-capital case. LSA-C.Cr.P. art. 791. The trial court noted that there had been nothing in the newspapers for a long time about thq case and repeatedly charged the jury as follows:
*646 “. .. Also, and this is extremely important, at all times during the course of the trial you should not read anything about the case in the newspaper or watch the T.V. about it or listen to the radio about the case. I do not know whether this case will be reported by the media or not; that is not my prerogative, but it is extremely important that in this case, as in all cases, you base your decision upon the evidence which is presented here in this Courtroom and from no other source whatever. That is extremely important, and it could very well be that you will be called upon from time to time during the course of this trial to testify yourself under Oath as to whether or not you adhered to that instruction. Hopefully, and I know that you would all want to be able to answer truthfully that you had adhered to that instruction and that you have not read the newspaper or listened to the T.V. or the radio about the case. I want to be as nice about that instruction as I can and as tactful as I can; but I must be also as firm as I can that you absolutely must not refer to the newspaper or the television or the radio about the case. The case should be decided on the evidence here in this Courtroom and from no other source, and you will please adhere to that instruction.” (Tr. 107-108)
There is no showing that the jury disregarded the judge’s instructions and thereby prejudiced the defense.
This assignment lacks merit.
ASSIGNMENTS OF ERROR NUMBER FIVE AND SIX
These assignments were not argued and are considered abandoned. State v. Joseph, 425 So.2d 1261 (La., 1983); State v. Kenner, 384 So.2d 413 (La., 1980); State v. Brumfield, 329 So.2d 181 (La., 1976).
ASSIGNMENT OF ERROR NUMBER SEVEN
Defendant argues that the trial court erred in denying a challenge for cause of juror Albert Payne.
Dr. Nash, a witness, had been Payne’s family physician for several years. While Payne indicated at one point that he would probably believe Dr. Nash rather than a physician he did not know, he was later rehabilitated. See State v. Bates, 397 So.2d 1331 (La., 1981). In response to the court’s questioning, Payne stated that he would consider the testimony of Dr. Nash like that of any other witness and would give it no undue weight.
Although Payne served as a juror, Dr. Nash’s only evidence was factual and un-contradicted. He said Washington had gonorrhea.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER EIGHT
Defendant contends that Dr. Clarence H. Webb should not have been allowed to testify because his evidence was not corroborated by medical testing and was unduly prejudicial.
Because of a vaginal discharge, Tashenna was taken to Dr. Webb, a specialist in pediatrics. He testified that Tashenna had a thick yellowish, white puss discharge. His tentative diagnosis was gonorrheal vagini-tus. Since the laboratory technician was not there that day, a senior medical student prepared the slide. Dr. Webb did not supervise, the student, who could not make a positive finding. A culture was ordered. An antibiotic cream was prescribed. Tash-enna returned three days later with the same symptoms. Although her culture was negative, Dr. Webb was convinced that Tashenna had gonorrheal vaginitus and prescribed penicillin. In Dr. Webb’s experience, cultures are often handled improperly resulting in a false negative report. He has also received a negative culture report one day and a positive report one or two days later. A false negative is more likely than a false positive. Twenty-four hours after the penicillin was prescribed, the discharge and redness were gone. This prompt response to the penicillin confirmed Dr. Webb’s diagnosis. Dr. Webb was not aware *647 of any infection other than gonorrhea which had this appearance and would also respond so promptly to penicillin and was therefore certain that Tashenna had gonorrheal vaginitus. He had no doubt about it.
The specimen obtained from Tashenna met the specifications of the testing laboratory. The expert who tested the specimen did not know whether it was properly handled prior to reaching his lab. There was testimony from Linda Tower, an expert in veneral disease but not a physician, that a heavy white or yellowish puss discharge or a prompt response to penicillin would not necessarily indicate gonorrhea. She admitted that it is more difficult to determine gonorrhea in females because there are so many other organisms in the vaginal vault and the laboratory results in females are not totally conclusive.
Since Dr. Webb was absolutely certain that Tashenna had gonorrhea, the trial court did not err in allowing his testimony. Although the tests results did not confirm the diagnosis, this relates to the weight rather than admissibility of the evidence. The evidence was highly relevant and admissible. LSA-R.S. 15:435 and 441.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER NINE
Defendant contends that his oral statement to the police should not have been allowed in evidence because the state failed to prove a knowing and intelligent waiver of his rights.
In December of 1978, Dr. M.E. Hellinger, a psychologist, tested Washington with a modern version of the Wechsler Adult Intelligence Scale, revised for use with disadvantaged people. Washington’s verbal I.Q. was seventy-eight; his performance I.Q. eighty-one, and his full scale I.Q. seventy-seven, placing him in the slow learner to low average range of intelligence. Since he was in jail and academically impoverished, Washington’s test results did not necessarily represent his intelligence. Dr. Hellinger thought Washington was in the average range of intelligence. Washington’s school testing in 1972 agreed with Hellinger’s findings. In his expert opinion, there was no language in the Miranda warning[2] which would confuse Billy.
Dr. Donald K. Gucker, a clinical psychologist, testified that he saw Washington twice in June of 1979. On the verbal section of the Wechsler Adult Intelligence Scale, Washington had an I.Q. score of sixty-one points which places him in the middle to mild range of mental retardation. His reading level was grade one, and he had poor comprehension. In Gucker’s opinion, Washington would have trouble comprehending his Miranda rights.
According to the police officers, Washington was given his rights at the time of arrest, said he understood them but refused to sign a waiver. At a jail interview, Washington was again given his rights and they were explained sentence by sentence. Washington signed the rights card and dated it. Washington then said, in effect: “Just give me your gun, or a knife or let me have my belt or something and I’ll take care of myself for what I have done.” (Tr. 774) Washington refused to give any details.
After hearing the above testimony, the trial court concluded that the statement by Washington was made freely and voluntarily. Although expert Gucker questioned *648 Washington’s ability to understand the Miranda rights in set form, the testimony that this language was explained to him in simpler words convinced the trial court that there was an intelligent and knowing waiver.
Hellinger testified unequivocally that Washington was capable of understanding his rights, whereas Gucker, who gave Washington a lower test score, did not. However, past school testing for Washington was consistent with Hellinger’s findings. Hellinger’s testing was done much closer to the time of Washington’s statement than Gucker’s testing. The state established that Washington’s statement was made after an intelligent waiver of his rights and the statement was properly admitted into evidence.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER TEN
Defendant contends that the state should not have been allowed to elicit testimony about his attempt to evade apprehension at the time of his arrest.
Flight indicates a consciousness of guilt and is relevant evidence. State v. Davies, 350 So.2d 586 (La., 1977); State v. Wilkerson, 403 So.2d 652 (La., 1981). Washington’s attempt to avoid arrest does not meet any of the criteria in LSA-R.S. 14:108.[3] Therefore, his evasiveness did not constitute a crime. There was no prejudicial evidence of another crime. Compare State v. Lee, 381 So.2d 792 (La., 1980) and State v. Molinario, 383 So.2d 345 (La., 1980), U.S. cert. denied 449 U.S. 882, 101 S.Ct. 232, 66 L.Ed.2d 106 (1980), which dealt, respectively, with escape and bail jumping. In any event, because there was no contemporaneous objection, appellate review of this issue is not required. LSA-C.Cr.P. art. 841.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER ELEVEN
Defendant contends that the trial court allowed impermissible references to other crimes.
Officer Burns was asked whether he knew Washington by sight. Burns replied: “Yes, I had seen him on several occasions in the past.” (Tr. 690) Officer Jackson replied in answer to a question that he was “familiar” with Billy Ray Washington.
Neither of the above references indicate other crimes, and the trial court did not err in admitting the evidence. LSA-C.Cr.P. art. 770.
This assignment lacks merit.
ASSIGNMENTS OF ERROR NUMBER TWELVE AND THIRTEEN
Defendant contends that the physical lineup and the in-court identification were both tainted by the impermissibly suggestive photographic lineup. It is argued that depicting Washington in the photographic lineup wearing his blue jogging jacket made his photograph the focus of the Ballard family’s identification. Also, defendant argues that Washington was the only man who appeared in both the photo *649 graphic and physical lineups and this emphasized him in the physical lineup.
The police erred in showing defendant’s photograph in his blue jacket. However, the identification took place shortly after the attack when Tashenna should have had a clear memory of the offender’s face. She had pointed Washington out on the street as the offender prior to the photographic lineup. The blue jacket did not make her identification unreliable. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2248, 53 L.Ed.2d 140 (1977). The physical lineup and in-court identifications were positive and unequivocal. At least one man besides Washington in the physical lineup bears a strong resemblance to a man in the photographic lineup. The trial court did not err in denying defendant’s motion for a mistrial.
These assignments lack merit.
ASSIGNMENT OF ERROR NUMBER FOURTEEN
Defendant contends that a new trial should have been granted because the evidence, in particular the identification, was suspect and insufficient to sustain the conviction. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Although Tashenna was only six at the time of the crime, her identification was positive and was corroborated by evidence that she contracted gonorrhea from Washington. Defendant’s statement to police, flight from her father, and attempt to evade arrest also indicated guilt. The evidence was sufficient to support the verdict.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER FIFTEEN
Defendant contends that his fifty year maximum sentence was excessive.[4]
The trial court noted several factors favoring a maximum sentence: Defendant claimed to be armed and there was evidence of an actual rather than attempted rape. Defendant, although only eighteen at the time of this crime, had a juvenile record and past incarceration in the Louisiana Training Institute. As an adult, he had eight convictions of unauthorized use of movables and two attempted escapes from custody, all showing a criminal propensity. Defendant is a menace to society with his proclivity for criminal activity. There was serious harm to the victim, both physically and psychologically, and no provocation, justification or excuse. Obviously the six year old victim did nothing to induce the crime. There is substantial evidence of other rapes and/or attempted rapes of children. Although technically a first felony offender, Washington’s history indicates he would not respond favorably to probationary treatment. A lesser sentence would deprecate the seriousness of his crime.
The trial court considered the Pre-Sen-tence Investigation report, which shows some mitigating factors: Washington has never known his father and uses his mother’s name. He was mistreated by his stepfather. His mother gave him to a great aunt at the age of four and Washington remained with' that aunt until he went to the Louisiana Training Institute at the age of thirteen. His grandmother describes him as not “all there” and a great deal of trouble. The Pre-Sentence Investigation report shows how Washington became the man he is but indicates little likelihood that he will change.
There is no question that Washington is a danger to society, particularly young children. In view of the shocking nature of the crime, Washington’s record, and the evidence of actual rather than attempted rape, the trial court did not abuse its discretion in imposing the fifty year sentence.
This assignment lacks merit.
DECREE
For the foregoing reasons, the conviction and sentence of defendant, Billy Ray Washington, are affirmed.
AFFIRMED.
CALOGERO, J., concurs and assigns reasons.

. Tashenna was specific on this point.

. S-9 is the card from which Washington’s rights were read to him. It states:
“ ‘You are under arrest for your part in the offense of aggravated rape.’
“I hereby notify you that you have a right to remain silent and you are not required to make any statement unless you want to do so voluntarily. Anything you say will be used against you in a court of law. You also have a right to consult with your attorney and to have him present with you. If you cannot afford an attorney, one will be appointed to represent you.
“While you are not required to make any statement, you may waive those rights just explained to you and you are given the privilege of saying anything you want to about this case. Now with this understanding and waiving those rights just explained to you, do you wish to make a statement and tell how this happened?”

. LSA-R.S. 14:108 provides:
“Resisting an officer is the intentional opposition or resistance to, or obstruction of, an individual acting in his official capacity and authorized by law to make a lawful arrest or seizure of property, or to serve any lawful process or court order, when the offender knows or has reason to know that the person arresting, seizing property, or serving process is acting in his official capacity.
“The phrase ‘obstruction of as used herein shall, in addition to its common meaning, signification and connotation mean:
“(a) Flight by one sought to be arrested before the arresting officer can restrain him and after notice is given that he is under arrest.
“(b) Any violence toward or any resistance or opposition to the arresting officer after the arrested party is actually placed under arrest and before he is incarcerated in jail.
“(c) Refusal by the arrested party to give his name and make his identity known to the arresting officer.
“(d) Congregates with others on a public street and refuses to move on when ordered by the officer.-.
“Whoever commits the crime of resisting an officer shall be fined not more than five hundred dollars or be imprisoned for not more than six months, or both.”

. Washington was previously sentenced to four consecutive fifty year sentences, one for each of the four convictions. State v. Washington, supra.