458 So.2d 507 (1984)
STATE of Louisiana
v.
William CHEVALIER.
No. KA-1741.
Court of Appeal of Louisiana, Fourth Circuit.
September 26, 1984.
*509 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Joanne C. Marier, Asst. Dist. Atty., New Orleans, for plaintiff-appellee.
Noland & Boasso, Gary W. Bizal, William Noland, New Orleans, for defendant-appellant.
Before GULOTTA, LOBRANO and ARMSTRONG, JJ.
ARMSTRONG, Judge.
On February 22, 1983, defendant William Chevalier was indicted for first degree murder in connection with the stabbing death of Elmore Caliste. The defendant *510 pleaded not guilty and not guilty by reason of insanity. Following trial by a jury of twelve, Chevalier was convicted of second degree murder. Accordingly, he was sentenced to serve a term of life imprisonment in the custody of the Louisiana Department of Corrections without probation, parole, or suspension of sentence.
The defendant now brings this appeal, seeking reversal of his conviction on ten assignments of error.[1] We affirm.
For convenience of discussion, we shall immediately treat the last assignment.

ASSIGNMENT OF ERROR NO. 13
By this assignment, appellant contends that the prosecution failed to present sufficient evidence to support a conviction for second degree murder.
In reviewing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Fuller, 414 So.2d 306 (La. 1982).
Viewing the evidence in a light most favorable to the prosecution, these are the salient facts:
It is not disputed that William Chevalier killed Elmore Caliste by stabbing him repeatedly on the morning of January 10, 1983.
At one time, Chevalier and Caliste had been good friends. They first became acquainted at Lafayette General Hospital in the mid-1970s. Caliste was recovering from an amputation of his left leg, and Chevalier was employed as an orderly. Sometime after discharge from the hospital, Caliste moved to New Orleans, and later, so did Chevalier. Their friendship continued, and in fact, they saw each other on a regular basis.
In April 1982, Caliste attended a small gathering at Chevalier's house, accompanied by a young friend named Leward Marshall. Chevalier was introduced to Marshall and immediately "felt a very strong attraction" to him. Apparently the attraction was mutual because when Marshall returned to the house the next day, he asked Chevalier if he could live with him.
It is not clear from the record whether Marshall actually did move in with Chevalier; it suffices to say that despite the difference in their agesMarshall was fourteen; Chevalier was thirty-seventhey soon developed an extraordinarily close friendship. Chevalier professed a great interest in Marshall's education, and when the boy blamed his perpetual truancy on the lack of clothes to wear to school, Chevalier either bought the clothes or supplied the money for them.
In late December 1982, Chevalier broke the relationship and moved to Houston. His motive, so he explained at trial, was to spare Marshall the emotional hardship of being labelled a homosexual, a hardship which Chevalier himself knew well, having been in and out of psychiatric institutions since the early 1960s because of (as he put it) inability to deal with his sexual orientation. Chevalier was aware that the boy's schoolmates had already tagged him as a "sissy", and he thought the continuation of his relationship with Marshall would only further that perception among the boy's peers.
Before leaving for Houston on December 19, 1982, Chevalier extracted Marshall's promise to attend school regularly and to avoid Caliste, whom the defendant believed to be homosexual.
Late in the evening on January 9, 1982, Chevalier telephoned the home of a friend in New Orleans, expecting to find Marshall there. Upon being told that Marshall had been seen riding around town with Caliste, *511 Chevalier went into a rage. In his words, "it was just like somebody struck me with a knife or a gun or something. It looked like my whole life drained out of me." Tr. 172.
Shortly afterward, Chevalier penned this suicide note:
"Dear Momme:
Please find it in your heart to understand why I did this. I just couldn't go on living and being hurt anymore. Right now while writing this letter I feel like my whole world is ended. I tried hard to be happy and still I couldn't find it. All my life it's been one hurt after another. I just can't take it anymore. I know I hurt all of you by doing this but it was my only way out. I just couldn't take it anymore. Maybe you can understand.
Why I had to do that lil boy the way I did, well, I just couldn't let him get away with all the changes he put me through after all what I did for him and he let a stupid silly Bitch like Caliste tell him what to do. Well, if he lives through this He'll always remember not to hurt anyone again. He will also never be able to have sex again. I'll make sure of that.
Please bury me with my wig on. Pray for me for maybe I'm going to a better place.
 Your mixed up son,
 Lee
I love you Millie and all my brothers and sisters."
Chevalier boarded a late-night bus from Houston and arrived in New Orleans around 11:00 a.m. He went immediately to a dime store on Canal Street and bought a long kitchen knife, then travelled by public service bus to New Orleans East, where Caliste lived and where he hoped Marshall would be. Chevalier got off the bus at a transfer point and went into a Time-Saver, where he bought a half pint of vodka. At the next transfer point, he bought another.
The door to Caliste's residence was open when Chevalier arrived. He entered and drew the knife. Seizing Marshall by the arm, the defendant put the knife to the boy's neck and cut him. When Marshall struggled to get away, the defendant pushed him onto a pool table, stabbed him, then threw him across the sofa and stabbed him again. In all, Marshall was stabbed five times before he managed to escape from the house.
Marshall ran into the street, bleeding from the face and several other parts of his body. Briefly, he turned back toward the house. The defendant, however, was in the doorway yelling that he was going to kill Caliste, and in the next moments, Marshall heard the victim's screams for help.
Marshall ran toward a neighbor and told her to call the police. Within a short time, Officer Roy D'Arcangelo arrived in a New Orleans Police squad car. He spoke to Marshall briefly, then approached the door of Caliste's residence and knocked. After a minute or so, Chevalier appeared at the door and said, "Please come in, I just stabbed him." Chevalier was immediately ordered out of the house and arrested; he was then advised of his rights and placed in the back of the squad car.
When the New Orleans Police homicide team arrived, they found Caliste's body just inside the door. Signs of a struggle were everywhere: there were large amounts of blood throughout the living room; a broken knife blade lay across the room from the body, its matching knife handle near the body itself; a meat cleaver was on the floor several feet from the decedent, and another meat cleaver and a butcher knife were on the kitchen table; several cooking utensils and other knives lay scattered about the blood-smeared kitchen floor.
Caliste had received sixteen knife wounds, among them, a stab wound which fractured the cheek bone just below the eye. He also suffered several stab wounds of the chest and upper abdomen, the most severe of which had entered the lower portion of the left lung and cut a multiple small artery. This, the fatal stab, had caused an accumulation of approximately a quart of blood in the victim's chest. Three wounds to the liver showed penetration to *512 a depth of about one inch. On the palm of Caliste's left hand and on his forearm were cuts which the coroner described as "defense-type" wounds, the kind that are usually inflicted when a person attempts to defend himself from a knife attack.
At 3:57 p.m., police transported Chevalier from the homicide scene to Charity Hospital. The defendant passed out in the accident room while awaiting treatment for slash wounds to his wrists. Apparently the vodka had taken its effecthospital records indicate that Chevalier was intoxicated.
Following treatment at Charity Hospital, the defendant was transported to the New Orleans Police Homicide Bureau where he gave a statement to detectives. Although Chevalier did not confess the killing, he did admit that it was his intention to "make (Marshall) pay for what he did," not by physically injuring him, but by scaring him with the knife. Chevalier also testified that it had been his intention to commit suicide in front of Marshall, hoping to arouse such guilt in Marshall that he too would kill himself.
La.R.S. 14:30.1 defines second degree murder, in pertinent part, as:
"the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm."
Appellant contends that his conviction must be reversed under Jackson v. Virginia, supra, because the State failed to prove specific intent and failed to disprove his claim of self-defense.
Appellant argues that the only direct evidence of specific intent was Marshall's testimony that just before the homicide, the defendant shouted, "I'm going to kill El". Chevalier contends that since Marshall's testimony concerning certain other issues was demonstrably false, it follows that his testimony must be disregarded in its entirety. Without Marshall's testimony, appellant argues, the State's evidence concerning Chevalier's specific intent is purely circumstantial, because the only witnesses to the actual killing were the defendant and the victim themselves. (It should be remembered that Marshall had left the scene and did not actually see the killing). This circumstantial evidence, appellant contends, was incapable of disproving Chevalier's claim that he killed Caliste in self-defense.
Appellant's arguments are without merit. Jackson v. Virginia, supra, does not afford this court the occasionmuch less, the jurisdiction[2]to question the credibility of witnesses.
Thus, we cannot question the credibility of Marshall's testimony that the defendant shouted his intention to kill Caliste, and viewing that direct evidence of specific intent in a light most favorable to the prosecution, any rational juror could have found that, beyond a reasonable doubt, the defendant had formed the requisite intent to commit second degree murder.
With respect to the contention that the State failed to disprove the defendant's claim of self-defense, it suffices to note that under La.R.S. 14:21, "[A] person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict."
Without question, the defendant was the initial aggressor. Thus, even if we were to accept as true the defendant's account of the events following Marshall's escape from the residencethat Chevalier simply closed the door and lay across the pool table, and that Caliste then attacked him with a knifewe could not recognize any right of self-defense asserted by the appellant. *513 By his own admission, Chevalier continued to hold the knife even as he lay across the table. The appellant therefore cannot be said to have withdrawn from the conflict "in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La.R.S. 14:21.
Accordingly, we hold that appellant's thirteenth assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 1
By this assignment, appellant contends that the trial court erred in not suppressing the inculpatory statement given by him to detectives at the homicide bureau. Chevalier maintains that he was intoxicated and extremely depressed when he gave the statement, and therefore, that the State did not prove his knowing and voluntary waiver of the rights announced in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In seeking to overturn his conviction on these grounds, defendant relies upon the testimony of a former co-worker, who stated that upon admission to the accident room at Charity Hospital, Chevalier appeared to be quite disoriented and that he, in fact, passed out. The hospital record reveals that Chevalier was intoxicated when he was admitted at 3:57 p.m. on the day of the killing.
The State has the burden to prove beyond a reasonable doubt that the defendant's statement was freely and voluntarily given. State v. Benoit, 440 So.2d 129 (La. 1983); State v. Burkhalter, 428 So.2d 449 (La.1983); La.R.S. 15:451. Where the accused is in custody, the prerequisite to the admissibility of a confession or inculpatory statement is the advising of the accused of his constitutional rights and his intelligent waiver of those rights. Miranda v. Arizona, supra.
Diminished mental capacity does not of itself vitiate the ability to knowingly and intelligently waive constitutional rights and to make a free and voluntary confession. The critical inquiry is whether, despite his diminished capacity, the defendant possessed sufficient understanding, such that his waiver of Miranda rights was truly voluntary. State v. Benoit, supra; State v. Lindsey, 404 So.2d 466 (La.1981); State v. Anderson, 379 So.2d 735 (La.1980).
The trial court's determination that a defendant's statement was free and voluntary is entitled to considerable deference by the appellate courts, and will not be disturbed on review unless unsupported by the evidence. State v. Harper, 430 So.2d 627 (La.1983); State v. Burkhalter, 428 So.2d 449 (La.1983).
In the present case, there is no serious dispute that the defendant was twice informed of his Miranda rights while in custody at the homicide bureau. The only question is whether Chevalier sufficiently understood his rights so as to permit a voluntary waiver.
At the hearing of the motion to suppress and at trial, both officers who interrogated Chevalier testified that at the time his statement was taken (5:30 p.m.), the defendant did not appear to be under the influence of alcohol. Both officers stated under oath that when the defendant was asked whether he understood his rights, he indicated that he did.
The officers' testimony is corroborated by a typed transcript and an audio tape which record the interrogation from beginning to end. We note that the text of Chevalier's statement reveals him to have been lucid and responsive to the officers questions. At no point did the defendant's former co-worker testify that the defendant was intoxicated, and the hospital record is silent as to the degree of Chevalier's intoxication. In view of this, and the fact that the interrogation did not begin until 5:30 p.m. (more than an hour and a half after defendant's admission to Charity Hospital), the trial court's finding that the defendant possessed sufficient understanding to voluntarily waive his Miranda rights is supported by the record, and thus will not be disturbed.
*514 Defendant also contends that his statement should have been suppressed because at no time during the giving of the statement did the officers advise him that his earlier waiver was not absolute and that he could terminate the questioning at any time.
Miranda does not require as much. Chevalier was advised of his rights three times prior to questioningonce at the scene and twice at the homicide office. Nothing said or done by the interrogators gave any cause to believe that the rights formerly waived could not be re-asserted.
Appellant's Assignment No. 1 lacks merit.

ASSIGNMENTS OF ERROR NOS. 2 and 6
By these assignments, appellant challenges the constitutionality of La.C.Cr.P. Art. 905.1 A, which requires that in a capital case, the sentencing hearing shall be conducted before the same jury that determined the issue of guilt.
Appellant also contends that the trial court committed reversible error by excusing "for cause" certain jurors who stated that they could not, under any circumstances, impose the death penalty. Appellant maintains that a "death qualified" jury denies an accused a fair cross-section of the community, and that such juries are necessarily predisposed toward finding the defendant guilty.
Article 798 of the Code of Criminal Procedure provides in part:
It is good cause for challenge on the part of the State, but not on the part of the defendant, that:
* * * * * *
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt.
In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), it was held that there is no constitutional bar to the exclusion of prospective jurors who would automatically vote against imposing capital punishment regardless of the evidence adduced at trial. Witherspoon remains the law of the federal courts, see Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) and of this State. See State v. Jackson, 450 So.2d 621 (La.1984).
Moreover, the appellant has no ground for complaint because the State used fewer than the twelve peremptory challenges to which it was entitled, La. Code Crim.Pro. Art. 800, and because the defendant by the jury's verdict was insulated from the death penalty. See State v. Jackson, supra; State v. George, 371 So.2d 762 (La.1979), cert. den., 444 U.S. 953, 100 S.Ct. 430, 62 L.Ed.2d 325 (1979).
This assignment is without merit.

ASSIGNMENT OF ERROR NOS. 3 and 4
By these assignments, appellant contends that the trial court erred in denying defense counsel's motion for individual voir dire and sequestration of prospective jury members.
Appellant acknowledges that the scope and conduct of voir dire is within the sound discretion of the trial judge and that his rulings in such matters will not be disturbed absent an abuse of that discretion. State v. Kirkpatrick, 443 So.2d 546 (La.1983); State v. Watson, 423 So.2d 1130 (La.1982); State v. Jordan, 420 So.2d 420 (La.1982). Appellant also concedes that although individual voir dire may be permitted by the trial judge, it is the defendant who bears the burden to demonstrate that special circumstances warrant such procedure.
Appellant argues that this case presented such special circumstances that the trial court's refusal to order individual voir dire *515 and sequestration constituted an abuse of discretion. The special circumstances alleged are the defendant's exposure to the death penalty and the unusually sensitive nature of the case itself, which at least implied a homosexual relationship between the thirty-eight year-old defendant and a fourteen-year-old boy.
The jury did not return a verdict of first degree murder in this case. The special circumstances of Chevalier's exposure to the death penalty were therefore removed as a ground upon which to challenge the trial court's ruling. State v. Penns, 407 So.2d 678 (La.1981).
Moreover, the facts of this case do not present such "special circumstances" as to provide ground for reversal, and considering that the evidence adduced at trial abundantly proved the elements of first degree murder,[3] it cannot be argued seriously that the jury which found the defendant guilty of a lesser charge was selected by a prejudicial method.
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. 5
By this assignment, appellant contends that the trial court abused its discretion in failing to excuse a juror whom defense counsel had challenged for cause.
During voir dire, the court heard the following exchange between defense counsel and prospective juror Talmage Moses:
BY MR. NOLAND:
Do any of you have members of your family who are either in police or law enforcement or security guard service or anything like that?
BY JUROR NO. 251, TALMAGE MOSES:
My daughter is a policewoman.
BY MR. NOLAND:
Where does she work?
BY JUROR NO. 251, TALMAGE MOSES:
In Orleans Parish.
BY MR. NOLAND:
Now
BY JUROR NO. 251, TALMAGE MOSES:
The Third District.
BY MR. NOLAND:
Now, we are going to have some testimony from bothwe call them police officers and civilians in this matter. Is the fact that your daughter is a police officer, would that fact perhaps, be is consciously or subconsciously, sway you in believing the testimony of a police officer, say, when that testimony was in conflict with a civilian? Do you understand what I'm saying? If two people get on the stand, and they tell a different story about the same thing, and one of them is a police officer and one of them is not a police officer, would you automatically tend to believe the police officer in that, in those circumstances?
BY JUROR NO. 251, TALMAGE MOSES:
(Nods affirmatively)
BY MR. NOLAND:
You would? And would that be because of your relationship with your daughter?
BY JUROR NO. 251, TALMAGE MOSES:
No.
BY MR. NOLAND:
Why would you believe the police officer over the civilian?
BY JUROR NO. 251, TALMAGE MOSES:
(Inaudible)
BY THE COURT:
I can't hear you, sir. What is that?
BY JUROR NO. 251, TALMAGE MOSES:
He inspected what went on.

*516 BY MR. NOLAND:
Okay. So you would, in fact, take the word of a police officer over a nonpolice officer if there was a conflict; is that correct?
BY JUROR NO. 251, TALMAGE MOSES:
(Nods affirmatively)
There was no further questioning of this juror by the defense. When defense counsel moved to excuse the juror for cause, the trial court denied the challenge for failure to establish a sufficient predicate. Defense counsel noted an objection, at which time the court afforded the defense an opportunity to pursue the matter further. Defense counsel rejected that opportunity and excused the juror peremptorily.
Appellant contends that the trial court's failure to excuse the juror for cause requires reversal of the conviction.
We disagree. The determination of the qualifications of a juror is within the sound discretion of the trial judge. Only when his exercise of discretion is arbitrary and unreasonable, to the prejudicial injury of the defendant in obtaining a fair and impartial trial, will appellate courts be warranted in setting aside a verdict. State v. Johnson, 324 So.2d 349 (La.1975); State v. Johnson, 263 La. 462, 268 So.2d 620 (1972).
It is true, as defendant asserts, that "a juror who will unquestioningly credit the testimony of law enforcement officers over that of defense witnesses is incompetent to serve". State v. Davenport, 445 So.2d 1190 (La.1984), State v. Nolan, 341 So.2d 885 (La.1977); State v. Jones, 282 So.2d 422 (La.1973). It is equally true, however, that jurors who initially voice some inclination to give more credence to policemen because they are trained observers are not automatically unqualified to sit as jurors. State v. Baldwin, 388 So.2d 664 (La.1980).
In the present case, the juror affirmed that he would "automatically tend to believe the police officer" rather than a layman because "he (the police officer) inspected what went on." But, as Baldwin stated, "[t]his does not imply that he would therefore accept their testimony without question". Id. at 671.
In numerous other cases, it has been held that an initial showing of a juror's bias toward police testimony does not prove fatal to a juror's competence, unless it is also shown that such initial bias is irremediable, that is, of such force as to prevent the juror from listening to the evidence and rendering a fair trial. State v. Allen, 380 So.2d 28 (La.1980); State v. Senette, 355 So.2d 923 (La.1978); State v. Nolan, 341 So.2d 885 (La.1977); State v. Governor, 331 So.2d 443 (La.1976); State v. Johnson, 324 So.2d 349 (La.1975). In the present case, the second of these elements was not shown, and thus, we cannot say that the trial court abused its discretion in refusing to excuse the juror for cause.
In so holding, we have noted the defendant's reliance upon State v. Jones, 282 So.2d 422 (La.1973), and have concluded that it is distinguishable from the case at bar. There, through questioning that was far more exhaustive than that in the present case, the defense and prosecution revealed not merely the juror's initial inclination to favor police testimony, but his firm commitment to unquestioningly accept such testimony over that of a layman. Ultimately, the juror stated, "In any fact I would go along with the policeman's testimony." Id. at 431.
In contrast to the thoroughly revealing responses of the prospective juror in Jones, the juror in the present case merely nodded approval to two leading questions propounded by defense counsel. Quite clearly, the trial judge did not believe that those responses showed an irrevocable commitment on the part of the juror to unquestioningly accept police testimony. Defense counsel rejected the trial court's suggestion to continue interrogation of the juror. We cannot say, on the basis of the record before us, that the trial judge abused his discretion in denying the defendant's challenge for cause.
*517 This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 7
By this assignment, appellant contends that the trial court erred in restricting defense counsel's voir dire of prospective jurors.
Appellant's assignment arises in this context:
During voir dire, a certain juror stated to the prosecutor that, because of long-held beliefs, she could not vote for the death penalty, regardless of what the evidence might be. The prosecutor then challenged the juror for cause. When defense counsel attempted to rehabilitate, his questions were aimed at eliciting the juror's understanding of the indictment. The trial court directed defense counsel to go to the heart of the matterthe juror's ability (or lack of it) to impose the death penalty under legally appropriate circumstances. Defense counsel objected to the court's limitation of voir dire. The trial judge responded that he was not limiting defense counsel's voir dire, and, in fact, he exhorted defense counsel to pursue questioning of the juror. Defense counsel declined.
We find in the foregoing facts no reason to hold that the trial court unreasonably limited the scope of voir dire.
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. 9
By this assignment, appellant contends that the trial court erred in admitting into evidence the proces verbal without authentication by the preparer of that document. Chevalier argues that without such authentication, its introduction into evidence constitutes a denial of the Sixth Amendment right to confront witnesses.
In the present case, Dr. Monroe Samuels (Chief Consulting Pathologist of the Orleans Parish Coroner's Office) performed the autopsy of Elmore Caliste, identified the proces verbal as having been prepared by the Coroner's Office, reviewed the proces verbal, and confirmed its findings with respect to the cause of death.
Dr. Samuels' identification of the proces verbal as having been prepared by his office was sufficient authentication, and under La.Code Crim.Pro. Art. 105, the coroner's proces verbal is excepted from the hearsay rule and is admissible in evidence as proof of death and the cause thereof. State v. Kelly, 375 So.2d 1344 (La.1979).
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 12
By this assignment, appellant contends that the trial court erred in refusing a fatigued juror's request to recess deliberation until the following day.
The trial record contains no verification that a juror requested a recess because of fatigue, nor does the record reveal that the defendant objected to the trial court's refusal to grant the recess.
In any event, we find no error in the trial judge's decision to have the jury proceed with deliberation. The minute entries show that the second day of trial began at 9:27 a.m. and that the jury recessed for a lunch break between 1:30 and 2:35 p.m. There followed two other breaks, the first from 4:00 p.m. until 4:25 p.m., and the second, from 6:30 p.m. until 7:15 p.m. The jury retired to deliberate at 9:54 p.m. and returned its verdict at 1:05 a.m.
We find nothing in the factseven as alleged by the appellantto warrant the conclusion that the trial judge abused his discretion in refusing to recess the deliberations. The record reveals that the defendant was accorded a full and fair trial.
This assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Assignments of error numbers 8, 10, and 11 were not briefed and are therefore deemed abandoned by the appellant. State v. Washington, 430 So.2d 641 (La.1983); State v. Joseph, 425 So.2d 1261 (La.1983).
[2] When a Louisiana appellate court reviews a conviction for sufficiency of evidence under Jackson v. Virginia, supra, it conducts a legal inquiry, not a factual one, State v. Moran, 400 So.2d 1359 (La.1981); and since our appellate jurisdiction does not extend to questions of fact, neither does it allow us to weigh the credibility of witnesses. La. Const. Article 5, § 5(C) (1974); State v. Richardson, 425 So.2d 1228 (La.1983).
[3] La.R.S. 14:30 provides, in part:

First degree murder is the killing of a human being:
* * * * * *
(3) when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.