692 So.2d 713 (1997)
STATE of Louisiana
v.
Eleston FISHER.
No. 96-KA-0004.
Court of Appeal of Louisiana, Fourth Circuit.
April 2, 1997.
*715 Harry F. Connick, District Attorney, Karen Godail Arena, Assistant District Attorney, New Orleans, for Appellee.
Sherry Watters, Orleans Indigent Defender Program, New Orleans, for Appellant.
Before BYRNES, ARMSTRONG and PLOTKIN, JJ.
BYRNES, Judge.
Eleston Fisher appeals his conviction and sentence for second degree murder. We affirm.
The record establishes that at about 4:48 p.m. on December 11, 1992, William Williams, known as "Pony Man", was shot down in an alleyway near 1224 South Salcedo Street in New Orleans. Shortly before that, Kevin Volson saw Williams in a nearby store playing a video game. Williams told Volson that he was waiting for someone. Volson then began playing a video game himself. A few minutes later Volson heard a shot, then someone he knew only as "Billy" came in and told him that "Pony Man" had been shot. Volson went out to the street and saw the victim lying in the alley and saw the defendant, Eleston Fisher, who told him someone had been shot. Volson left the area and went to his home, which was in the same building as the store, then came back out a few minutes later and held the victim until an ambulance arrived. He did not notice any weapons in the alley. The forensic pathologist who performed the autopsy found that the victim died of a shotgun wound to his face fired at close range.
Officers Lionel Brooks and Phyllis Varnell were among the first to arrive at the scene. They spoke to Volson, who told them he had seen the victim earlier that day with $200 cash. The officers looked for shells, but the only evidence they found was the victim's clothing. They then called out the crime lab to continue the search. Officer Carlton Lawless of the crime lab retrieved a spent Remington shotgun shell and an empty shell box in the alleyway. Officers Brooks and Varnell also canvassed the area for witnesses but found none. They did not see the defendant on the scene.
Officer Norman Taylor of the public housing liaison section also went to the scene. Officer Taylor testified that he grew up in *716 the neighborhood where the shooting took place, still had family living there, and he was there almost every day. He spoke to people in the neighborhood, who told him that the defendant was the shooter. Officer Taylor told them to let the defendant know that he wanted to talk to him. He did not see the defendant until May of 1993.
On May 22 Officer Taylor and Officer Darryl Dean were in the area on an unrelated call when he saw the defendant, who was a passenger in a car which was coming out of a driveway. Officer Taylor called to the defendant that he wanted to talk to him. The defendant yelled back to Officer Taylor that he wanted to talk, too, and would call him. The driver of the car continued on his way. Officer Taylor followed in a police car and signalled the driver to pull over. While Officer Dean talked to the driver, Officer Taylor talked with the defendant. He handcuffed him, and put the defendant in the rear of his police car. Officer Taylor testified that it was departmental policy to handcuff someone when putting the subject in a police car.
Officer Taylor testified that he asked the defendant if he knew what Taylor wanted to talk to him about. The defendant replied that he did and said that he wanted to talk to Taylor, too, to tell him his side of it. Officer Taylor then advised the defendant of his Miranda rights. The defendant said he was armed robbing the victim with a shotgun to his face when something startled him and the gun went off. The defendant said that the discharge of the shotgun was an accident. Taylor then took the defendant to the district station and called the homicide division. He told the defendant to just tell his side of the story.
Officer Lawrence Cohig was called to transport the defendant from the district station to the homicide division. As Officer Taylor related the defendant's oral statement to Officer Cohig, within the hearing of the defendant, the defendant stated that the victim "got what he deserved."
The defendant testified that he saw the victim lying in the alleyway and yelled out for someone to call an ambulance. He related that he remained on the scene for two to three hours that day. He stated that he saw Officer Taylor twenty or thirty times between the shooting and his arrest in May although he later admitted that maybe Officer Taylor did not see him.
The defendant testified that on the day of his arrest he was on his way to the barbershop when Officer Taylor called to him. He testified that he initially thought that the officers pulled the car over because the driver went through a red light. He admitted that when another officer drew his weapon, Officer Taylor told him to put it away. The defendant testified he was never read his rights. He further testified that Officer Taylor told him to tell the judge that he robbed the victim then shot him.
On July 22, 1993 the defendant was charged by bill of indictment with second degree murder. On August 11, 1994 a jury found the appellant guilty as charged. On December 6, 1994 a motion for new trial was denied and the defendant was sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. The defendant's appeal followed.

III. ERRORS PATENT REVIEW

A review of the record for errors patent reveals that there were none.

A. ASSIGNMENT ONE

The defendant avers that the trial court erred by denying the motion to suppress the confession. The appellant argues three reasons why the motion to suppress should have been granted: (1) Taylor arrested the defendant without probable cause, which tainted the alleged waiver of the right to remain silent and confession; (2) The alleged confession was inculpatory, but was treated by the trial court as exculpatory; and (3) The state failed to prove a voluntary and knowing waiver of his rights.
The defendant first claims that the actions of Officer Taylor amounted to an arrest of the defendant without probable cause. In State v. Allen, 95-KA-1754, p. 5-6 (La.9/5/96), 682 So.2d 713, 718-719, the Louisiana Supreme Court stated:

*717 La.C.Cr.P. art. 201 defines arrest as "the taking of one person into custody by another... [by] actual restraint of the person." In distinguishing between an investigatory stop and an arrest, courts have considered numerous factors. In Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the United States Supreme Court found a stop for questioning was indistinguishable from a traditional arrest because the suspect was not questioned briefly where he was but transported to the police station, was never informed he was free to go and, in fact, would have been restrained had he tried to leave. The United States Supreme Court in Michigan v. Chesternut, 486 U.S. 567, 574, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting INS v. Delgado, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)) stated that "any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account all of the circumstances surrounding the incident in each individual case." The Mendenhall Court also stated that in determining whether a person has been seized under the Fourth Amendment, one must determine whether a reasonable person would have believed he was free to leave. Mendenhall, 446 U.S. at 554, 100 S.Ct. at 1877. This court has considered this issue and determined that "it is the circumstances indicating intent to effect an extended restraint on the liberty of the accused, rather than the precise timing of an officer's statements: `You are under arrest,' that are determinative of when an arrest is actually made." State v. Giovanni, 375 So.2d 1360, 1363 (La.1979) (quoting State v. Sherer, 354 So.2d 1038, 1042 (La. 1978)); see also, State v. Davis, 558 So.2d 1379, 1382 (La.App.1990); State v. Simms, 571 So.2d 145, 148 (La.1990). In both Giovanni and Simms, this court found an arrest based on the fact that the defendant was not free to leave.
In Allen the issue concerned the defendant's oral and subsequent written consent to search his vehicle after a stop. The court found only an investigatory stop rather than an arrest. When the defendant was asked if he owned a gun, he replied that it was in the trunk. The defendant then freely and voluntarily consented to the search of his car. The court noted that during this initial questioning there was no restraint on the defendant's liberty and he was free to leave at anytime. Specifically, no weapon or physical force was used to restrain the defendant. The deputies told the defendant they only wanted to ask him a few questions and he complied. The defendant was not subjected to a search for weapons nor placed in a police car nor handcuffed. Because the consent to search arose from a legal investigatory stop, the motion to suppress evidence obtained as a result of the car search was determined to be properly denied by the trial court.
In the present case, the defendant did not voluntarily comply with Officer Taylor's initial request to talk to him. When he left the scene in a car driven by another, Officer Taylor followed. The fact that the defendant was in handcuffs when he was placed in the police car was not brought out at the motion to suppress, but was related by the officer at trial. An appellate court, in reviewing a ruling upon a motion to suppress, may consider not only the evidence presented at the motion hearing, but also the evidence adduced at trial. State v. Brooks, 92-3331 (La.1/17/95), 648 So.2d 366, 372.
Probable cause to arrest exists when the facts and circumstances known to the officer and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution to believe the person to be arrested has committed a crime. State v. Dubuclet, 623 So.2d 668, 669 (La.App. 4 Cir.1993).
The Court, in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), noted that an informant's "veracity", "reliability" and "basis of knowledge" are all highly relevant in determining the value of the report, and the information may establish probable cause for a warrantless arrest, so long as the basis for the information and the informant's reliability, when examined under *718 the totality of the circumstances, are established. An arrest occurs when circumstances indicate an intent to effect an extended restraint on the liberty of an accused, rather than at the precise time an officer tells an accused he is under arrest. State v. Commodore, 418 So.2d 1330 (La.1982).
In the present case Officer Taylor testified that he stopped the defendant because several people in the neighborhood told him that Fisher was the murderer. Fisher admitted that he and Officer Taylor knew each other and that he saw the officer twenty or thirty times between the shooting on December 11, 1992, and May 22, 1993. Further, when the officer yelled to him, the defendant said he would call Officer Taylor and left in a car driven by someone else.
When Officer Taylor yelled at the defendant, Fisher admitted that he knew Officer Taylor wanted to talk to him. A law enforcement officer may stop a person in a public place whom he reasonably believes is committing, has committed, or is about to commit an offense. La.C.Cr.P. Art. 215.1. "Reasonable suspicion" for an investigatory stop is something less than the probable cause required for an arrest, and the reviewing court must look to the facts and circumstances of each case to determine whether the detaining officer had sufficient articulable facts within his knowledge to justify an infringement of the suspect's rights. State v. Matthews, 94-2112 (La.App. 4 Cir. 4/26/95), 654 So.2d 868. In assessing the reasonableness of an investigatory stop, the court must balance the need to question the defendant against the invasion of privacy entailed. The test for determining whether one has a reasonable expectation of privacy is not only whether the person had an actual or subjective expectation of privacy, but, rather whether that expectation is of a type which society at large is prepared to recognize as being reasonable. Twenty-Three Thousand Eight Hundred Eleven and No/100 ($23,811) Dollars in U.S. Currency v. Kowalski, 810 F.Supp. 738 (W.D.La.1993); State v. McKinney, 93-1425 (La.App. 4 Cir. 5/17/94), 637 So.2d 1120; State v. Lambright, 525 So.2d 84 (La.App. 3 Cir.), writ denied, 530 So.2d 83 (La.1988).
In reviewing the totality of circumstances, the officer's past experience, training and common sense may be considered in determining his inferences from the facts at hand were reasonable. State v. Jackson, 26,138 (La.App. 2 Cir. 8/17/94), 641 So.2d 1081. Deference should be given to the experience of the policemen who were present at the time of the incident. A certain look or gesture may not mean anything to the ordinary person; however, a policeman has sound judgment based on long experience to interpret these acts.
In the present case, considering that the allegations from people in the neighborhood and the fact that the defendant had been in the neighborhood and had seen Officer Taylor many times after the murder but was not seen by the officer, indicating that the defendant previously did not make himself available, the circumstances were sufficient to justify an investigatory stop.
Inherent in the officer's right to make an investigatory stop of an individual and to demand his name, address, and explanation of his actions is the right to detain the subject temporarily to verify information given or to obtain information independently of his cooperation. State v. Cabanas, 594 So.2d 404 (La.App. 1 Cir.1991), writ denied 598 So.2d 371 (La.1992); State v. Moncriffe, 522 So.2d 1187 (La.App. 4 Cir.1988). An investigatory stop, requiring only a reasonable suspicion, is as complete restriction on the liberty of movement as an arrest; a stopping for investigation is not lesser intrusive because the restriction of movement is incomplete, but rather because it is briefer than an arrest. State v. Vincelli, 555 So.2d 21 (La. App. 1 Cir.1989); State v. Walker, 530 So.2d 1200 (La.App. 2 Cir.1988), writ denied 532 So.2d 763 (La.1988); State v. Senegal, 95-796 (La.App. 3 Cir. 12/6/95), 664 So.2d 832.
In the present case, when the officer told the defendant that he wanted to talk to him, ordinarily a person would reasonably believe that the officer meant that he wanted to talk at that time, particularly when the officer yelled to him. The fact that the officer yelled, also indicated to the driver of the *719 car that the officer meant that he wanted to talk to the defendant at that instant. Probable cause to arrest exists when the facts and circumstances known to the officer and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution to believe the person to be arrested has committed a crime. Because the defendant did not comply with the investigatory stop but left, Officer Murphy had probable cause to follow the two subjects and to stop, detain, and arrest the defendant although Officer Murphy testified that he did not arrest the defendant but handcuffed the defendant and placed him in the police car for transportation to the police station for questioning.
In State v. Allen, supra, the Supreme Court found that the consent to search arose from a legal investigatory stop when the deputies told the defendant they only wanted to ask him a few questions and he complied. However, in the present case, the defendant did not comply when the officer yelled that he wanted to talk to the defendant, and the defendant left with the other subject who drove away in a car. Therefore, in the present case, the officer had the added facts that the defendant directly failed to comply with the officer's request and also left which was an added indication of the defendant's culpability. Therefore, the prior reasonable suspicion that the officer had to make an investigatory stop ripened into probable cause to arrest the defendant under the totality of the circumstances.
Even if the officer only had reasonable suspicion to stop and question the defendant, the fact that the Officer Taylor had not been able to find the defendant for questioning from December 11, 1992 until May 22, 1993, and the fact that the defendant did not stop but left, established that the officer had reason to believe that the defendant should be detained and transferred to the police station for questioning because of his apparent actions to avoid the police. If the officer's suspicions are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances. Cabanas, supra. Placing the defendant in handcuffs to insure that the defendant did not try to leave was reasonable under the totality of circumstances. The police officer's methods of detention were, justified, and the defendant thus was properly detained for questioning.
The defendant also claims that his statement was not voluntary. The State must prove beyond a reasonable doubt that a confession was freely and voluntarily given. La.R.S. 15:451; State v. Burkhalter, 428 So.2d 449 (La.1983); State v. Brown, 598 So.2d 565 (La.App. 4 Cir.1992), writ denied 605 So.2d 1092 (La.1992); State v. Chevalier, 458 So.2d 507 (La.App. 4 Cir.1984). The State must show that a defendant who confesses during a custodial interrogation was advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Benoit, 440 So.2d 129 (La.1983); State v. Chevalier, supra. Refusal to sign a written waiver alone is not evidence of an involuntary waiver. State v. Singleton, 381 So.2d 828, 830 (La.1980).
Officer Taylor related that he gave the defendant his Miranda warnings right after the defendant said he wanted to talk. Then the defendant gave his statement. The defendant testified that he was never given his Miranda warnings, and he further stated that Officer Taylor told him to tell the judge that he robbed the victim and shot him. Conflicting testimony as to factual matters is a question of weight of the evidence. State v. Converse, 515 So.2d 601 (La.App. 1 Cir. 1987); State v. Delatte, 504 So.2d 1067 (La. App. 1 Cir.1987). When testimony is conflicting, the credibility of the witnesses is a determination which is within the sound discretion of the trial court. Like all questions of fact, this determination is entitled to great weight and will not be disturbed unless clearly contrary to the evidence. It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. Even where the record contains conflicting evidence, the evidence accepted by the trier of fact is not rendered insufficient. State v. Teeter, 504 So.2d 1036 (La.App. 1 Cir.1987). Rather, the appellate court should evaluate the minimal constitutional sufficiency of evidence as set forth in Jackson v. Virginia, supra. State v. Falls, 508 So.2d 1021 (La.App. 5 Cir.1987).
*720 In the present case the record shows that there was sufficient evidence that the defendant was given his Miranda waiver of rights before he made his statement, and it was freely and voluntarily given.
The fact that the defendant's statements were voluntarily given, precludes a review of the defendant's contention that the trial court based his denial of the motion to suppress in part on its conclusion that the statement was exculpatory.

B. ASSIGNMENT TWO

The defendant also argues that his right to cross-examination of Officer Taylor was erroneously limited. A criminal defendant's right to cross-examination is a fundamental right guaranteed by the Sixth Amendment of the United States Constitution applicable to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The right is further guaranteed by the Louisiana Constitution and the Louisiana Code of Evidence. La. Const. art. I, § 16 (1974) and La. C.E. art. 611(B). The right to cross-examine a witness includes the right to question the witness concerning any bias or self-interest attached to the witness's testimony. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); State v. Senegal, 316 So.2d 124 (La.1975); La. C.E. art. 607(D). However, the right to confrontation is not so unlimited as to require permitting a defendant on cross-examination of state witnesses to make any and all inquiries of whatever character. State v. Ware, 345 So.2d 33 (La.1977). The inquiry must be relevant. State v. Mason, 305 So.2d 523 (La.1974).
The defendant argues that his right to cross-examination was limited on two issues. The first issue dealt with a complaint filed by the defendant relative to an alleged beating by two Sixth District officers. The incident was alleged to have occurred approximately ninety days prior to the instant offense. Overruling state objections, the trial court permitted defense counsel to ask Officer Taylor if he was aware that the defendant suffered a head injury and had hearing problems as a result of the alleged incident. Officer Taylor answered that he was not aware of the incident. Defense counsel then asked Officer Taylor if he was aware of the complaint that the defendant had lodged with Internal Affairs. The trial court sustained the state's objection to this question. Considering that Officer Taylor had already testified that he was not even aware of the incident, the trial court reasonably denied defense counsel's attempt to elicit a different answer on the follow-up question. As to this area of inquiry there was no prejudice and no error.
The second issue dealt with an alleged shooting of the defendant's nephew by Officer Taylor's brother. This incident is alleged to have occurred in July of 1994, a year and a half after the murder and only one month prior to the trial. The trial court sustained questioning about the incident after defense counsel had already brought the matter to the attention of the jury. The trial court sustained the objection because the alleged incident occurred after the alleged statement was made to Officer Taylor. This particular determination is illogical because a bias which develops anytime prior to trial still may affect the witness's testimony and credibility. Defense counsel was then permitted to question Officer Taylor about relations between his family and the defendant's family. Taylor admitted that there might be problems between members of his family and the defendant's family, but there had not been a problem between himself and the defendant. The issue was thus sufficiently brought to the attention of the jury for it to determine whether or not this problem between the two families affected the credibility of Officer Taylor. Thus, the limit imposed by the trial court did not prejudice the defendant.

C. ASSIGNMENT THREE

The defendant contends that the trial court erred by denying his motion for new trial. The defendant raised three grounds in the motion for new trial: (1) the erroneous admission of the defendant's statements; (2) the limitation of the cross-examination of Officer Taylor; and (3) the existence of newly *721 discovered evidence. The first two issues were discussed in the previous assignments.
To prevail on a motion for new trial based upon newly discovered evidence, the defendant must show that the evidence was discovered since the trial, the failure to learn of the evidence at the time of trial was not due to a lack of diligence on the defendant's part, the evidence is material to the issues at trial, and the evidence is of such a nature that it would probably produce an acquittal in the event of a retrial. State v. Prudholm, 446 So.2d 729, 735 (La.1984).
The alleged newly discovered evidence dealt with the shooting incident which defense counsel attempted to develop at trial. At the motion hearing one of the defendant's brothers, Malcolm Hawkins, testified that he and another brother fought with Officer Taylor and Taylor's brother. Hawkins further testified that he left the scene and when he came back, he discovered that his brother and nephew had been shot. Hawkins was in Orleans Parish jail on a probation hold when the defendant went to trial. The defendant was aware of the incident prior to trial. If anything was newly discovered, it was the involvement of Officer Taylor in the incident, a fact which, with due diligence, could have been discovered prior to trial. As to the grounds of newly discovered evidence, the motion for new trial was properly denied.

D. ASSIGNMENT FOUR

The defendant avers that the evidence was insufficient to sustain the conviction. When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A defendant cannot be convicted on his own uncorroborated confession without proof that a crime has been committed by someone, i.e. without proof of corpus delicti. State v. Celestine, 452 So.2d 676 (La.1984), certiorari denied by Celestine v. Louisiana, 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 154 (1984). Once corpus delicti is independently established, a confession alone may be used to identify the defendant as the perpetrator of the crime. Id.
Dr. Paul McGarry performed an autopsy and testified that the cause of death was a gunshot wound to the face. No weapon was found on the scene which would indicate a suicide. This adequately established corpus delicti as to a homicide. See State v. Fountain, 93-2561 (La.App. 4 Cir. 12/15/94), 647 So.2d 1254, writ denied, 95-0140 (La.6/23/95) 656 So.2d 1010. The statement by the defendant to Officer Cohig, that the victim deserved to die, would permit a finder of fact to infer that the homicide was committed with intent, satisfying the elements of La.R.S. 14:30.1(A)(1). The evidence is sufficient to sustain the conviction.
Accordingly, the defendant's conviction and sentence are affirmed.
AFFIRMED.
PLOTKIN, Judge, dissenting.
The exclusion of evidence intended to show Officer Taylor's bias or malfeasance and the admission of a statement made only in the presence of this officer, when considered in light of the overall paucity of evidence in this case, convinces me that this defendant was denied a fair trial. At trial, Officer Taylor testified that Fisher stated that he accidentally shot the victim during a robbery. Officer Cohig testified that as he prepared to transport Fisher to the station, Fisher said that the victim got what he deserved. Kevin Volson testified that he exited a store and saw Fisher standing in the street shouting that someone had been shot. This was the case against the defendant.
After a hearing on the motion to suppress Fisher's statement to Officer Taylor, the trial judge determined that this was an exculpatory statement was made voluntarily during a valid investigatory stop. The majority has reviewed the record and found that the circumstances justified this detention. I respectfully disagree.
The following testimony was provided by Officer Taylor at the November 19, 1993 *722 motion hearing to justify the investigatory stop:
Q. Okay, and the reason why y'all stopped him because he had no license plate, is that correct?
A. Not really. II had wanted to talk to Tee Tee, or Eleston, I had been wanting to talk to him since earlier in the year about an incident that had occurred back of town, back on Salcedo Street.
....
Q. You had stated that you wanted to talk with Mr. Fisher because of an incident that had occurred earlier in the year?
A. Well, it was in December of '92, I believe it was.
Q. Why Mr. Fisher?
A. Well, like I say, I have been knowing Eleston, well, we call him Tee Tee, for years, and the murder occurred in the neighborhood where we both grew up at. I went back there during the time they were investigating the murder, the actual day of the murder, and from speaking with the people in the neighborhood, I was informed that Tee Tee, Eleston, had committed the murder, and
Q. Specificallyspecifically, what people told you this?
A. Beg pardon?
....
Q. I need to know specifically who it was that told you that Mr. Fisher made statements to them, admitted to the murder?
A. There were several people that came to me and statedstated that Tee Tee had committed the murder?
Q. How did they know?
....
A. Basicallywell, notnot actually witnessed the murder. Like I say, it's a small neighborhood, everybody knows everyone back there and basically know everything that goes on in the neighborhood. As far as anyone coming up and saying they actual witnessed the murder, no.
....
Q. So, no one that told you Mr. Fisher committed the murder witnessed him commit the murder?
A. I don't know if they witnessed it, I couldn't say if they didn't.
Q. Okay.
A. They didn't tell me they witnessed it, they knew that he had committed the murder, though.
Q. Did those people tell you that Mr. Fisher confessed to them that he did the murder?
A. No.
Q. How did they know?
A. Again, this is a close knit community, basically everybody knows everything that goes on in the neighborhood. I means it's a very small community. Everybodymost of the people been back there for years, his family's been back there for years, and it'sit's just known in the community, it was known in the community who had committed the murder. These people came to meI grew up in the neighborhood. The people that came to me came to me andand informed me who had committed the murder.
....
Q. Okay, no one told you that they saw him commit the murder and no one told you he confessed to them that he in fact committed the murder.
A. No one told me they had witnessed and no oneno.
Q. And you based your stop of Mr. Fisher that day, several months later, on the assumption that because rumor had it in the neighborhood that he committed the murder, that he in fact did?
A. No so much as rumors, what people came up and told me.
The following testimony was provided by Officer Taylor at the motion hearing to establish that Fisher's statement was voluntary:
Q. Okay. Now, did Mr. Fisher speak with you?
A. Yes, he did.

*723 Q. Alright. Did you advise him of his rights before he spoke with you?
A. Not really. I advised him like when he started toto tell me something.
Q. Okay. Now, so you interrupted him then
A. Yes.
Q. once he started talking. Okay, you advised him of his rights. Did he acknowledge that he understood those rights?
A. He didn't say it, he justhe just talked.
....
Q. Okay. Did you anywayyou said you stated earlier that you knew the defendant, Mr. Fisher, from before. Did you anyway force or threaten him into making a statement?
A. No, ma'am.
Q. Alright. Did you reduce a statement to writing?
A. Not really, I sent him up to the homicide division for him to give a statement. It's my understanding that he refused to give a statement once he got to homicide.
Q. Okay, but he had given a statement to you. Was there anybody else present when he gave this statement to you?
A. He-he and I were in my car and we were talking.
At trial, it was established that Fisher was stopped, handcuffed, and detained for questioning in the back of Officer Taylor's car. Despite his suspicion that Fisher was the shooter, Officer Taylor conceded that he never spoke directly with the investigating homicide detectives and only left a message with an unknown person at the homicide division on one occasion before arresting Fisher himself.
Assuming for the sake of argument that Fisher was not in fact arrested at the time he was handcuffed and placed in the back of Officer Taylor's car, the central issue of this appeal is whether Officer Taylor had reasonable cause to make the investigatory stop. As in State v. Wilson, 366 So.2d 1328, 1331 (La.1978), the testimony quoted above contains no basis on which to evaluate the credit and reliability of the information relied upon by Officer Taylor in deciding to stop Fisher. This testimony does not establish that this information was any more substantial than a casual rumor circulating in the community or an accusation based merely on Fisher's reputation. See id.; see also Spinelli v. U.S., 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Accordingly, the trial judge clearly erred in admitting the statement.
After a review of the record, I believe that there is a virtual certainty that the admission of this statement contributed to the verdict and therefore I cannot find this error harmless. Unlike in State v. Massey, 535 So.2d 1135, 1140 (La.App. 2d Cir.1988), the illegality of the initial detainment in the instant case is highly relevant and in fact produced the statements which amount to nearly the entire case against the defendant. Moreover, Fisher's defense consisted of his denial that he shot the victim, his denial that he made any statement to Officer Taylor, and his explanation that officers of the Sixth District beat him and threatened retaliation through Officer Taylor if he took action against them. Although the defendant was permitted to testify about his problems with Sixth District officers and Officer Taylor in particular, the defense was restricted from fully cross examining Officer Taylor on these issues. This excluded information is clearly relevant to the defense's theory that Officer Taylor framed Fisher in retaliation.
Specifically, the defense was prevented from cross examining Officer Taylor on facts surrounding Fisher's complaint to the Internal Affairs Division and an allegation that Officer Taylor's brother shot the defendant's nephew. Because of the complete absence of any physical evidence or eyewitnesses, the defendant could only have been convicted on the basis of a choice of credibility between the defendant and the officer. By restricting the defendant's right to cross examine Officer Taylor on matters intended to show his bias or malfeasance in office, the jury was denied information relevant to the officer's credibility. After reviewing the testimony, I cannot say that the jury would have reached the same conclusion had the defense been *724 able to fully cross examine Officer Taylor on the defendant's allegations.
Accordingly, I would reverse Fisher's conviction and sentence and remand for a new trial.