812 So.2d 128 (2002)
STATE of Louisiana
v.
Robert CURRIE, III.
No. 2000-KA-2284.
Court of Appeal of Louisiana, Fourth Circuit.
February 13, 2002.
*129 Harry F. Connick, District Attorney, Leslie Parker Tullier, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff/Appellee.
Herbert V. Larson, Jr., and John Wilson Reed, Robert Glass, Glass & Reed, New Orleans, LA, Counsel for Defendant/Appellant.
LOVE, Judge.
The defendant, Robert Currie, appeals his convictions for second degree murder and attempted second degree murder. For the reasons assigned herein, we vacate the original convictions, find the defendant not guilty of second degree murder and attempted second degree murder by reason of insanity, and remand the matter to the trial court for sentencing in accordance with these findings.

STATEMENT OF THE CASE
The defendant was charged by bill of information with one count of second degree murder, La. R.S. 14:30.1, and one count of attempted second degree murder. La. R.S. 14:27(30.1). He was arraigned September 8, 1997, and pled not guilty. On September 24, 1997, he changed his plea to not guilty and not guilty by reason of insanity. On January 8, 1998, a lunacy hearing was held, and the defendant was found incompetent to stand trial. On March 9, 1998, the defendant was again found incompetent to stand trial. After six-months of treatment, he was found competent to stand trial. A motion to suppress evidence was denied March 26, 1999. On August 26, 1999, a twelve-member jury found the defendant guilty as charged. He filed a motion for new trial. The motion was denied November 9, 1999. The defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on the second degree murder conviction, and to twenty years at hard labor without benefit of parole, probation, or suspension of sentence on the attempted second degree murder conviction. The sentences were ordered to be served concurrently. The defendant filed a motion for appeal.

FACTS
On June 14, 1997, around noon, the defendant, a troubled fifteen year old at the time of the crime, stabbed his mother, Jacqueline Currie, and his friend, Gene Battistelli, at a French Quarter Hotel while the three were on a trip from Memphis, Tennessee. The mother died of injuries from twenty-four stab wounds to her head down to her knee, with wounds so deep that one entered her nasal cavity, another her lung, and another severed her spine. The wounds were inflicted with great strength in an apparent attempt to hit her heart.
The defendant had come to New Orleans earlier in the year, in February, as a runaway from his father's house. On that visit, he became friends with a circle of "Goths", young people who typically dress *130 in black and share an interest in the occult and vampirism. In particular, he came to know a man known as "The Draven" a/k/a Joshua Johanas. The defendant returned to Memphis where he and Battistelli convinced Jacqueline Currie, with whom they were living, that the defendant owed someone money in New Orleans and that he was in danger. The three set out for New Orleans, and along the way Jacqueline Currie bought the knife for the defendant that he would later use to kill her.
In New Orleans, they checked into the Historic French Quarter Inn, and the two teen-agers immediately left to find the defendant's friends, particularly The Draven. They found him at a coffee shop the group frequented. The defendant drank liquor and took two hits of acid. The group proceeded to party all through the night. They returned to the hotel where the defendant wanted to bring two women they had met into the room where Jacqueline Currie was asleep. Battistelli thought they should not, and an argument ensued. The defendant and The Draven left, and Battistelli and Jacqueline Currie went to sleep.
Battistelli and Jacqueline Currie were having coffee by the pool when the defendant returned mid-morning. The defendant said he had to go to the bathroom and grabbed the keys to the room from his mother's hand even though a bathroom was nearby at the pool. He returned from the room, stabbed the two of them, then returned to the second floor of the hotel.
Sergeant James King found the defendant, within minutes of answering the call, sitting in a yoga position on the second floor of the hotel. He was looking straight forward with his arms extended out over his knees. Both of his wrists were cut, and blood was dripping from his neck. When asked, he told King his name. When asked the identity of the person in the courtyard, he said, "That's my mother." King entered the open door of the nearby room and found a great deal of blood in the dressing area and blood smeared over a mirror, apparently spelling a message.
Battistelli said he met the defendant in a rehabilitation center when he was sixteen years old. He saw him in Memphis in a coffee shop after the defendant's first trip to New Orleans. Battistelli had nowhere to stay, and the defendant offered that he could live with him and his mother in exchange for work on the house. The defendant really wanted to come back to New Orleans to buy clothes, but the two told the defendant's mother that people were looking for him to collect money he owed. The two also planned that Battistelli would find a living space with The Draven so that when the defendant went away to school, he would have a place to run away to. Battistelli said the defendant did not act strange on the way down to New Orleans, and that he had done nothing in the days leading up to the trip to suggest that he had lost touch with reality. He said during their friendship, he had to "calm down" the defendant only once when the defendant had taken LSD and slapped his mother in the face. At some time prior to the trip to New Orleans, Jacqueline Currie had taken a knife the defendant owned to have it professionally sharpened at the defendant's request. When the defendant told her that he had forgotten the knife, she bought him another one on the way to New Orleans.
Once in New Orleans, Battistelli, The Draven, and the defendant smoked pot, drank alcohol, and the defendant took two hits of LSD. He appeared fine during the evening. After they returned to the hotel and the above mentioned girls left, Jacqueline Currie, the defendant, Battistelli, and the Draven remained in the room. Battistelli *131 was awakened sometime after dawn by a fight between the defendant and his mother. The defendant started swinging at Battistelli and broke a chair in the room. Battistelli tried to calm the defendant down and have him take a shower. The defendant seemed very upset and agitated. The three (the defendant, Battistelli, and The Draven) went back to a coffee shop where they had been earlier. They returned to the hotel at 11:00 a.m. The mother was sitting at a table by the pool. The defendant snatched the keys to the room from her hand. Battistelli followed the defendant to the room. The defendant exited the room and sliced Battistelli's throat. The mother ran up, and the defendant started to stab her. Battistelli threw an ashtray at the defendant, and he stabbed Battistelli in the shoulder. The defendant continued stabbing his mother, and then began cutting himself. He said, "This is how I end it all." Battistelli grabbed the knife and threw it toward a stairwell. The defendant retrieved the knife. Battistelli grabbed an aerosol can from a nearby maid's cart, and told the defendant that he had a lighter and would burn his eyes out. The defendant smiled, sliced his own throat, and walked up the stairs of the hotel. He then walked back down and said, "I'm okay. Everything is okay."
On cross-examination, Battistelli said the defendant was hearing voices the night he committed the crime, and that he had come to believe he was a vampire and he was immortal. There were times that Battistelli thought that the defendant might not know who he was, and there were times when the defendant stated that he wished he had a gun so that he could kill himself. He admitted that the defendant was acting strange and that he thought he was acting that way because of the drugs.
A maid from the hotel testified that she saw the defendant the morning of the crime, and that he "looked strange" and was wringing his hands.
Officer John Ronquillo arrived at the scene and announced to the defendant that he was from homicide. The defendant asked, "Is my mother dead?" and then said, "I just can't believe I killed my mother." He said the defendant did not make any statements that were out of touch with reality or were bizarre.
The emergency room nurse said that when asked who should be notified that he was in the hospital, the defendant said he wanted to tell his mother. The nurse knew he had killed his mother, and she asked him if he remembered what happened. After a long pause, he said, "Well, is my mother dead?" When she told him she was, he thought for a long time before saying, "Well I guess I killed my mother." He said, "The Draven made me do it" and appeared as if he might be hallucinating. She said he acted like schizophrenic patients she had seen.
An officer that rode with the defendant in the ambulance also said the defendant said, "The Draven made me do it." He said the defendant was very strange, "cold."
The defendant's maternal aunt testified to the defendant's grandfather's mental instability. She said the victim was mentally unstable, told grandiose lies, had difficulty with reality, suffered from depression, and suffered from sexual abuse at the hands of their father. The defendant had a difficult delivery and forceps had been used which deformed his head, cut off his blood supply, and caused him to have a stroke. He was paralyzed on one side of his body for seven days. As an infant, he cried inappropriately and cried as if he were in pain.
*132 The defendant's paternal grandmother said she has obsessive compulsive disorder. She said her son, the defendant's father, suffered child abuse at the hands of her husband.
Dr. David Goldstein, a clinical psychologist in Memphis, said he first treated the defendant in March 1993 in a hospital where he had been admitted for engaging in bizarre behavior including violent threats at school, threatening to blow up the school, threatening to kill students and teachers all very uncommon behavior for an eleven year old. He had flat affect and was pre-occupied with violence. He was suspicious and paranoid and thought people were taking and removing thoughts from his head. He could not separate reality from fantasy. The doctor said these symptoms were psychotic and that the defendant suffered from a "very, very serious illness." He had hesitated to diagnose the defendant with schizophrenia because of the label it placed on the child. He said the defendant's anger toward his mother increased to the point that he had to live with his father. The doctor stated that it was obvious both of the defendant's parents loved him very much, but that they had different parenting styles, with the mother being more permissive. He said the mother seemed to have the same flat affect as the defendant.
Dr. Hal Brunt, a child and adolescent psychiatrist, said he treated the defendant from 1993 to 1995. He said the parents had divorced when the defendant was two and a half years old. The defendant lived with his mother until 1993 when he moved in with his father at age eleven. The doctor recommended hospitalization after the initial interview which resulted from the above discussed threats at school. He said the defendant had bizarre thoughts including images of bodies being chopped up and burned and eaten by sharks. He could not differentiate reality from fantasy. He was depressed, had few friends and was isolated. He had been medicated for depression and attention deficit disorder. He met all of the diagnostic criteria for paranoid schizophrenia. He also had evidence of organic brain damage, perhaps caused by the delivery or an accident he suffered when he was one year old that fractured his skull. The doctor placed him on anti-psychotic and anti-depression medication. He continued to have unstable relationships, suicidal thoughts accompanied by self-mutilation, transient psychotic episodes, and paranoid ideation. At one point, the doctor agreed to take him off of the anti-psychotic medication because the defendant was complaining of slow-thinking, but he was back in the hospital within two and a half weeks. By 1995, the doctor had diagnosed the defendant with borderline personality disorder. The defendant stopped seeing him in December 1995, and the doctor assumed that the medication ran out. He said persons with mental disorders are much more vulnerable to the effects of drugs taken recreationally.
Dr. Jodi Holloway, psychiatrist, said she was assigned to the defendant's case after it was determined that he was not competent to proceed to trial. She diagnosed him as a paranoid schizophrenic with polysubstance dependence. She determined he was psychotic by his withdrawn demeanor, his difficulty interacting, his paranoid delusions, and his apparent auditory hallucinations. He had dreams of being impaled and other persecutions. He was suicidal: storing aspirin in overdose quantities at the hospital, trying to hang himself, bashing his head against the wall. He believed he had supernatural powers including the ability to stare into the eyes of humans and animals to scare them and the ability to move cars with his mind. The doctor said schizophrenics are at particular risk to become drug users. Family *133 members, in particular mothers, are at particular risk of harm. The condition is strongly genetically based. A family that is dysfunctional can exacerbate symptoms.
Dr. Kenneth Perez, child psychiatrist, said he treated the defendant while he was on the adolescent wing at Southeast Louisiana Hospital in Mandeville, from March 1998 to July 1999 when he was transferred to the adult unit. He described him as psychotic and depressive. He said the defendant's brain was under a lot of stress, and in many situations such as his, the brain will interpret noise stimulation as voices from religious figures. In the defendant's situation, he thought he was hearing the voice of Seth, the Egyptian god of death. He had turned to Seth after he had been sexually abused as a child, and thought Seth would protect him from the taunts of schoolmates that he was queer. The doctor felt there was a strong possibility that he had inherited schizophrenia from his mother, and that he had an extraordinarily unusual early onset of the disease. His chances of suffering from schizophrenia were further enhanced by his grandfather's schizophrenia.
Another aunt, wife of the defendant's father's brother, said the defendant looked very unhealthy in the time preceding the murder. His fascination with vampires had grown to the point that he believed he was one. She witnessed the defendant on one occasion lash out at his mother seemingly without provocation, only to tell her he loved her moments later. It seemed to her that the defendant was "two different people." She noted a marked change in the defendant's behavior after his first trip to New Orleans.
His same age cousin and self-described best friend said the defendant believed in vampires and that he had eternal life.
The defendant's father said the defendant was their only child and that the divorce, which occurred when the child was two and a half, had been a difficult one. He said he was much stricter with the defendant than his mother, and admitted to hitting him on many occasions. The defendant's relationship with his father's wife was very poor. The father had difficulty keeping the defendant on his medicine and allowed him to go off of it completely before the defendant's first trip to New Orleans. The father said the defendant preferred the mother which made the father jealous. He testified to the difficult birth and other traumatic events in the defendant's early life and further explained the defendant's history of hospitalization for mental illness which began at the age of six.
Dr. Sarah Deland, clinical psychiatrist, testified she is often asked to evaluate people with regard to their sanity at the time of the offense. She said she only finds about ten percent of the people she evaluates to have been insane at the time of the offense, and cautioned that even that ten percent is of a group already known to have a mental illness. In this case, she met with the defendant only four days after the crime. She also interviewed an extensive list of people including family members, neighbors, and the psychiatrists and psychologists that treated the defendant over the years. She said that she determined that the defendant suffers from paranoid schizophrenia and that he suffered from that disease when he committed the crime. She said that his family's extensive history of mental illness put him at greater risk for the disease. Also, his brain injury at birth and a brain injury suffered at one year old contributed. She noted his increased delusions and fascinations with death and vampires, which he believed to be real. He also had strange patterns of not eating and sleeping for days at a time. The doctor stated that *134 schizophrenics also often use street drugs to help them feel better, to suppress voices, and to help them sleep. She was confident in her determination that the defendant did not know right from wrong when he killed his mother, and said he was definitely ill at the time, having been off of his medication for over a year. In the days before the crime, he had become increasingly frightened and paranoid and thought The Draven was involved in a war for souls and the people surrounding him were "imposters" including The Draven, Battistelli, and his mother. The doctor pointed out that the defendant committed the crime in broad daylight with people around, made no attempt to flee, and then slashed his wrists and throat. She said schizophrenics are at a great risk for suicide. They often take out violence on people they know because they have trouble in relationships and are not close to other people. They begin to fear the people they are around on a continual basis; here, the defendant was closest to his mother. She said that while people with him on the night before the crime said he had taken drugs, there was no proof that he had taken any, or that the drugs he had taken were effective, or that they had not worn off by the time of the crime. Nothing on his hospital admission records was indicative of his having taken drugs.
The State presented one witness to rebut the strong defense: Dr. Harminder Mallik, forensic psychiatrist. Dr. Mallik said he conducted the same evaluations as Ms. Deland. He evaluated the defendant for the fist time November 18, 1997, and found the defendant to be incompetent to stand trial. He met with the defendant on four subsequent occasions and examined all of the same records that Ms. Deland had examined. He interviewed the majority of the same people. His diagnosis of the defendant's mental state at the time of the offense was hallucinogenic intoxication, alcohol and cannibis abuse, history of major depression with psychotic features, and history of intermittent explosive disorder on Axis I. Axis I is a measure of clinical psychiatric syndromes. He said the defendant "has a mental disorder, but I don't think, in my opinion, to a reasonable degree of medical certainty that those disorders caused him to be incapable of distinguishing between right and wrong at the time of the offense." The doctor reported the defendant's long history of drug taking, told to him by the defendant and corroborated by his best friend, starting with drinking vodka and whiskey in the morning before school when he was nine; continuing with smoking half a bag of marijuana a day; smoking "Premo" which is marijuana with crack added; inhaling nitrous oxide; eating hallucinogenic mushrooms; smoking Ritalin; dropping acid; shooting cocaine; taking "Absence" which is alcohol fermented with Cartlum, annis seeds, fennel, and Tujon which is a "legal" hallucinogenic; and smoking PCP.
The defendant described to the doctor the events leading up to the crime, including his running away from his father because his father was going to commit him, taking Ritalin, and stealing money from his father to get to New Orleans. He said he was suicidal. He found a "squat", or a homeless person's hut, to live in. He went to Alabama, met a girl who did not drink or do drugs, and the two planned they were going to buy a van to drive to California. He got bored and came back to New Orleans where he started hanging around with "guts" or gutter people. He met The Draven, but started having stomach problems and was out of money so he called his mother who flew him home. In Memphis, he started hanging out at a coffee house and re-met Battistelli, with whom he had previously been in rehab. Battistelli was not liked at the coffee shop *135 because people thought he was a narc and that people were trying to hurt him. Battistelli moved in with the defendant and his mother. His mother wanted to send the defendant to a Christian camp. He and Battistelli talked his mother into bringing them to New Orleans by telling her that he owed someone $200.00 for furniture. He did not sleep for a day or two before he came to New Orleans. Before they left, he got into a fight with his mother and called her a slut. She slapped him. He claimed to be sober at the time. He described the trip down, including his misplacing a knife he carried for protection and buying a new one. Once here, he took two hits of acid around 11:00 p.m. and another at 1:00 a.m. The acid began effecting him in about forty-five minutes. He began having visions including seeing The Draven with yellow eyes, and flags around the world. He went back to the hotel, woke up at 6:30 a.m. still having visions, and went for a walk with The Draven. He saw the word "death" in the morning paper. The two went to Café Du Monde but were not served. He went back to the coffee shop he frequented, squatted on a chair, and was thrown out. He went by the cathedral and felt something was speaking through him, telling him lies and not to do drugs. He thought "this is the end." He was fidgeting so much that The Draven encouraged him to get rest. He felt eternal. He went back to the hotel room and thought someone was coming to hurt him. The doctor said the defendant then skipped over the rest of the story, including the killing, and "realized something had happened" when he threw the knife. The defendant told the doctor, "It was a really bad trip, and it was an accident on my part."
Dr. Mallik further testified that the defendant was able to describe small details and draw an accurate map of the events which were corroborated by Battistelli and by the doctor himself on a tour of the hotel. He said these factors indicated "goal driven" behavior and that the defendant was able to determine right from wrong at the time he committed the crimes.
On cross, he said that the defendant appeared very disturbed while sharing his experiences. He seemed to be responding to internal stimuli, and listening to "souls." He would close his eyes, and exhibit peculiar hand gestures as if he were twirling.

ASSIGNMENT OF ERROR NO. 1:
The defendant argues it was error for the trial court to deny his motion for new trial which was based on the fact that the jury was sleep deprived, cognitively impaired, and acting in the mistaken belief that it would not be allowed to rest until it returned a verdict. The defendant further argues that the trial court should have considered affidavits from two jurors to that effect.
The last witness, Dr. Mallik, ended his testimony at 10:45 p.m. Closing arguments began at 11:00 p.m. The time is not noted for the beginning of jury instructions, but there was no objection. The jury began deliberating at 12:15 a.m. At 4:10 a.m., defense counsel asked the judge to bring the jury down. The judge said he wanted to give the jurors fifteen more minutes and would inquire as to the jurors' wishes at 4:30 a.m. The trial judge therefore denied the defense's request to inquire into whether the jurors wanted to retired for the night. At 5:00 a.m., the jury returned to the courtroom, and one juror asked for the definition of "not guilty", "not guilty by reason of insanity" and "insanity." After the judge re-read the definitions, he asked the jurors if they wanted to continue deliberating. The foreperson said, "Yes, for about fifteen minutes." There were no objections to further deliberations. *136 The jury returned with the verdicts at 6:20 a.m.
In support of the motion for new trial, the defense submitted the affidavits of two of the jurors. The trial court refused to consider the affidavits citing La. C.E. art. 606(B) which was "self-explanatory." Article 606 provides (B):
B. Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
The Louisiana Supreme Court has interpreted the predecessor of the statute in a second degree murder conviction where the defendant alleged that the trial court erred in not allowing him to question two jurors regarding daily prayer services held by the jury foreman, a Presbyterian minister, for the jurors and the possible effect of such religious services upon the jury's deliberations. The Court stated:
The policy behind our "jury privilege" statute, R.S. 15:470, is to preserve the confidentiality of the deliberation among jurors and to add to the finality of jury verdicts. State v. Wisham, 384 So.2d 385, 387 (La.1980). The privilege is not absolute and we have recognized that it must yield to a substantial showing that the defendant was deprived of his constitutional rights. State v. Sinegal, supra;[1]Durr v. Cook, supra.[2]
State v. Graham, 422 So.2d 123, 126 (La.1982).
In Graham, the Court held that religious services among jurors do not amount to a substantial deprivation of constitutional rights necessary to overcome the prohibition against juror testimony.
Historically, the law was intended to preserve the finality of jury verdicts and the confidentiality of discussions among jurors. State v. Richardson, 91,2339 (La. App. 1 Cir. 5/20/94), 637 So.2d 709; State v. Harris, 597 So.2d 163 (La.App. 2 Cir. 1992). As the Supreme Court has further stated: "[N]o juror is competent to impeach the verdict of the jury on which he served. .... This firmly-established rule prevents jurors from impeaching their verdict by disclosure of jury deliberations or even by testimony of misconduct within the jury room." State v. Abney, 347 So.2d 498, 502 (La.1977).
Although not strictly held in criminal cases where, as explained above, there are additional constitutional considerations, in civil cases "affidavits and other testimony by jurors cannot be used as evidence to impeach a jury's verdict." Uriegas v. Gainsco, 94-1400 (La.App. 3 Cir. 9/13/95), 663 So.2d 162, 170, citing Pitts v. Bailes, 551 So.2d 1363 (La.App. 3 Cir.1989); Theriot v. Theriot, 622 So.2d 257 (La.App. 1 Cir.1993); Coleman v. Brooks, 583 So.2d 133 (La.App. 4 Cir.1991). "One reason for this rule is that if, after being discharged *137 and mingling with the public, jurors are permitted to impeach verdicts which they have rendered, it would invite tampering with the jurors and would place it in the power of a dissatisfied or corrupt juror to destroy a verdict to which he had deliberately given his assent under the sanction of oath." Parker v. Centenary Heritage Manor, 28,401 (La.App. 2 Cir. 1/26/96), 677 So.2d 568, 574.
Therefore, we find that court the trial court did not err in excluding the affidavits. Under the statute, the trial court was clearly correct. However, the court is under an obligation to follow the statute only to the extent that the defendant's constitutional rights to a fair trial have not been impinged. If it appears that the defendant did not receive a fair trial, the statute must yield. Here, even without consideration of the affidavits, a trial that runs from 9:50 a.m. until 6:20 a.m. is unprecedented. Deliberations have run into the wee hours of the morning before, see State v. Chevalier, 458 So.2d 507 (La.App. 4 Cir.1984) (deliberations from 9:54 p.m. until 1:05 a.m.); State v. Mack, 435 So.2d 557 (La.App. 1 Cir.1983) (deliberations from 10:40 p.m. to 1:50 a.m.); State v. Wright, 445 So.2d 1198 (La.1984) (deliberations from 11:00 p.m. until 3:00 a.m.), but a trial that lasted on its third day almost twenty hours merits our close scrutiny.
This court is shocked that the jury was permitted to deliberate for such a lengthy period of time. Surely, such an extensive period of deliberation into the early hours of the next day without any rest seriously compromises a juror's ability to be an alert and fair decision-maker. Nonetheless, we decline to resolve this issue because we find merit in the defendant's second assignment of error.

ASSIGNMENTS OF ERROR NOS. 2 & 3:
By this assignment, the defendant argues that the evidence was insufficient to find that he was able to distinguish right and wrong at the time of the offense.
The Louisiana Supreme Court was faced with the issue of insanity at the time of the offense in State v. Silman, 95 0154 (La.11/27/95), 663 So.2d 27, and set forth the applicable law as follows:
In Louisiana, a legal presumption exists that a defendant is sane at the time of the offenses. La.R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, defendant must show he suffered a mental disease or mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question. La.R.S. 14:14; State v. Williams, 346 So.2d 181 (La.1977). The determination of sanity is a factual matter. All the evidence, including expert and lay testimony, along with the defendant's conduct and action, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. State v. Bibb, 626 So.2d 913 (La.App. 5th Cir.1993), writ denied, 93-3127 (La.9/16/94); 642 So.2d 188; State v. Claibon, 395 So.2d 770 (La.1981). Lay testimony pertaining to defendant's actions, both before and after the crime, may provide the fact finder with a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the *138 time of the offense. State v. Peters, supra; State v. Claibon, supra.

In reviewing a claim for insufficiency of evidence in an action where an affirmative defense of insanity is raised, this court, applying the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. State v. Peters, 94-0283 (La.10/17/94); 643 So.2d 1222; State v. Nealy, 450 So.2d 634 (La.1984); State v. Price, 403 So.2d 660 (La.1981); State v. Claibon, supra; State v. Roy, 395 So.2d 664 (La.1981).
95-0154 at p. 7, 663 So.2d at 32.
In this case, this court cannot imagine a case wherein an insanity defense could possibly be more strong. Thus, the facts of the case simply do not support the conclusions of Dr. Mallik. This defendant was fifteen at the time of the crime, from a broken home in which both sides of his family had severe mental illnesses. He suffered organic brain damage at birth. He suffered a fractured skull at one year old. He was institutionalized by the age of six, and essentially diagnosed with schizophrenia by the age of eleven. He had little emotional support at home, and his own mother exhibited signs of schizophrenia. At the least, she exhibited signs of very poor judgment in bringing the defendant back to New Orleans and buying him a knife along the way. The father allowed him to be off of his anti-psychotic medication for over a year before the crime. He was suffering from delusions, hallucinations and ideas of persecution for some time preceding the crime. Although, admittedly, much of the evidence presented by the defense summarized his mental history prior to the crime and did not go to the ultimate fact of whether he understood right from wrong at the time of the offense, as explained by the experts, many of the factors present in his life contributed to or exacerbated his proclivity to have been unable to differentiate between right and wrong.
He committed the crimes in broad daylight in front of many witnesses. He did not attempt to flee. He was found within minutes in a trance-like state. After admitting he had killed his mother, he asked for her comfort shortly thereafter. These do not appear to be the acts of a man who can distinguish right from wrong.
Although Dr. Mallik's testimony was to the contrary, his conclusion of hallucinogenic intoxication was based almost exclusively on interviews with the defendant who reported his own drug use to the doctor at a time when he was psychotic. There was little corroboration of the history of his drug by independent or objective sources.
Applying the principles set forth in Silman, supra, to the facts and circumstances of the instant case and viewing the evidence in a light most favorable to the prosecution, this court finds that no rational trier of fact could have found that defendant failed to prove by a preponderance of the evidence that he was incapable of distinguishing between right and wrong, and therefore insane, at the time of the crimes. Accordingly, we vacate the original conviction and find defendant not guilty of second degree and attempted second degree murder by reason of insanity.

CONCLUSION
In conclusion, we vacate the defendant's conviction and sentencing, amend the conviction to guilty of second degree and attempted second degree murder by reason *139 of insanity and remand the matter to the trial court for sentencing on both counts.
CONVICTION VACATED AND AMENDED; REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS DECISION.
NOTES
[1] 393 So.2d 684 (La.1981).
[2] 589 F.2d 891 (5th Cir.1979).