JAMES F. McKAY III, Judge.
 

 STATEMENT OF THE CASE
 

 liThe defendant Gregory Truvia was charged by grand jury indictment on May 31, 2007, with first degree murder, a violation of La. R.S. 14:30. The defendant pleaded not guilty and not guilty by reason of insanity at his June 13, 2007 arraignment. He was found competent to proceed on April 8, 2008. The State amended the indictment on September 25, 2008 to reflect the charge of second degree murder. On December 10, 2008, the two-day trial ended with the defendant being found guilty as charged by a twelve-person jury. On January 22, 2009, the defendant was sentenced to life imprisonment at hard labor, without benefit of probation, parole or suspension of sentence.
 

 FACTS
 

 The defendant was charged with and convicted of second degree murder for the April 8, 2007 killing of his mother, Arthe-rine Williams.
 

 One of the defendant’s assignments of error on appeal is that the evidence is insufficient to support his conviction for second degree murder, because he proved by a preponderance of evidence that he was insane at the time of the commission of the crime.
 

 |2New Orleans Police Department Senior 911 Dispatcher Andrea Taylor identified an audiotape of a 911 call, which was played for the jury.
 

 Jamie Pichón testified that on April 8, 2007, she was living in a Federal Emergency Management Agency trailer on the campus of Southern University of New Orleans. Ms. Pichón woke up that morning to a loud moaning noise. She looked outside of her trailer to see the man who lived next door, dragging what she believed was a moaning person or an animal. The man dragged the object into his trailer. Ms. Pichón text-messaged her mother to telephone 911, because she was afraid if she did so the man would hear her.
 

 Forensic pathologist Dr. Richard Tracy autopsied the victim. She suffered minor injuries scattered over the body and serious injuries to her face. She had bruises, swollen bruises, swollen black eyes, ragged cuts of the kind one gets from a club-like object, and sharply incised cut edges with the absence of much of the tissue from the area. The cause of death was blunt force tears and sharply incised injuries to her face. The victim’s tongue had been torn almost completely out, and the blood loss from that injury was the biggest contributor to her death.
 

 New Orleans Police Department Officer Nakeisha Barnes and her partner, Officer Gregory Gavins, responded to a call at approximately 4:00 a.m. on April 8, 2007, at the SUNO trailer site on Pelopidas Street. The officers knocked on the door of the defendant’s trailer. The defendant appeared shirtless and covered in blood. The defendant stepped out onto the trailer staircase after being ordered several times to do so. He refused commands to put his hands up. The defendant stumbled coming down the steps and fell to the ground. He resisted being handcuffed by Officer Gavins. Officer Barnes attempted to assist, but the defendant turned and began coming in the officer’s direction. She emptied a can of ^chemical spray at defendant, but it had no effect on the defendant
 
 *672
 
 at all. She estimated the struggle with defendant lasted seven minutes, and he was not subdued until other units responded. The victim was sitting upright in the trailer in a slumped over position in a pool of blood. She was unresponsive. Officer Barnes identified photographs of the crime scene.
 

 United States Secret Service Agent Greg Gavins testified that on April 8, 2007, he was a New Orleans Police Officer and working that night with Officer Barnes. He recalled that the victim was nude, sitting in the trailer with her head slumped down, facing away from the front door. Agent Gavins’ testimony essentially tracked that of Officer Barnes with regard to the officers’ interaction with defendant. Agent Gavins said he too exhausted his can of pepper spray on the defendant and that it did not appear to have an effect on him. He and the defendant fell while struggling, and Agent Gavins was able to get one handcuff on him. Inside the trailer, Agent Gavins observed various pieces of flesh on the floor and pieces of teeth on the sofa. The agent confirmed on cross examination that the defendant made no attempt to elude the officers or run from them.
 

 New Orleans Police Homicide Detective Harold Wischan investigated the homicide. He observed what appeared to be drag marks coming from a ditch behind the trailer towards defendant’s trailer. He observed articles of female clothing on the steps leading to the trailer. The victim was sitting upright in a pool of blood, with her shoulders rolled forward and her head hanging forward. A fire extinguisher with blood on it was inside the trailer. Detective Wischan identified photographs and physical evidence recovered from the scene.
 

 Howard Williams, the defendant’s brother, testified that the victim was sixty-seven or sixty-eight years old at the time she was killed. She had a stroke a |4few months before her death. The defendant provided her with assistance after that stroke.
 

 Earl Truvia, another of the defendant’s brothers, testified that their mother and the defendant always had a beautiful relationship. The victim had been living in Texas and had only come to New Orleans on April 7, 2007, the day before she was killed. She came because she was concerned about the defendant’s situation. The defendant had been living in the trailer for around three weeks. Earl took the defendant from Texas. The defendant spent the night at Earl’s house, and then Earl brought him to the trailer. He would visit the defendant occasionally, and Earl said everything was okay until he received a telephone call from the defendant on April 5th or 6th, and he told Earl he did not want to live. Earl went to the defendant’s trailer and talked with him that night. Earl and his wife once took the defendant to University Hospital because the defendant said he had a stinging feeling running through his body and complained that he was hearing voices. They waited at the hospital for three hours, but left before the defendant was examined, after the defendant said he was all right.
 

 Earl stated on cross examination that the defendant was normal when he was living in Texas with their mother, and he changed only after living in the trailer in New Orleans. Earl also admitted that he, Earl, had been removed from the family dynamics for twenty-seven years prior to 2003. Earl said that on the night before the killing, when he left the defendant and their mother, which was around 11:00 p.m., defendant was “okay.”
 

 Dr. Sara Deland, a forensic psychiatrist, testified that when she first met with the defendant for the first time in early June 2007, he was “overtly psychotic.” He pri
 
 *673
 
 marily had thought disorganization, and he reported that he was hearing voices, |swhich Dr. Deland confirmed was consistent with someone overtly psychotic. She noted that the defendant was kind of disheveled and mainly stared at the floor or off into space, making very poor eye contact. The defendant was not taking any psychiatric medication at that time, but she thought he needed to be. She stated that the defendant appeared to be much better when she saw him a second time after he had been placed on anti-psychotic medication. He appeared even better on her third visit with him. She only saw him for forty-five minutes on the first visit, because he was having trouble focusing and responding. The subsequent visits were from between one and two hours.
 

 Dr. Deland reviewed the defendant’s arrest record, medical records from three hospitals and Orleans Parish Prison, and a limited report from the Seafarer’s Union about the defendant’s past employment. She also spoke with all of his brothers and sisters, and a couple of longtime family friends. She noted that in February 2007, the defendant visited Delgado Clinic, complaining that he was stinging all over his body and worrying that he might have syphilis. Records from Delgado indicated he did not have any kind of sexually transmitted disease. When the defendant went to a hospital in Dallas right befoi'e he returned to New Orleans, he also complained of stinging all over his body and that he had syphilis. She said he did not have syphilis that time either, and that “to this day” the defendant continues to believe he has syphilis.
 

 Dr. Deland testified that the defendant described a jolt of electricity that went through his body in Dallas, and that was how he knew he had some type of sexually transmitted disease. Dr. Deland stated that she had heard things like that before from psychotic patients. She said Orleans Parish Prison records showed that the defendant was kept in five-point restraints for two days, which, she said, | fiwas a serious matter. He reported to the psychiatric nurse at Parish Prison that he had been hearing some voices in the trailer before he was arrested. He was not hearing voices on the day the doctors at the prison saw him, and he was given a diagnosis of adjustment disorder with depressed mood, with a note of a major depression with psychotic features. Dr. Deland explained that in some people, when their depression is extreme, they have psychotic symptoms that go along with it, such as voices that tell them they are no good and to kill themselves. The person has a belief that he or she is a bad person and that they are going to die. She noted that in later notes from Parish Prison defendant reported that the voices had started up again, and significant improvement was noted after they gave him anti-psychotic medication. Dr. Deland stated that the defendant was in Southeast Louisiana State Hospital for approximately six months when he was sixteen years old, his first report of psychiatric problems. The defendant related that he was treated there with Haldol and Thorazine, which she said were both anti-psychotic medications.
 

 Dr. Deland stated that she diagnosed the defendant with something called psychotic disorder not otherwise specified. She said that basically meant the defendant has some psychotic symptoms. She suspected that the defendant suffered from schizophrenia, but that she would want to see him over a longer period of time to make that diagnosis. Dr. Deland was asked whether, with reasonable medical certainty, because of the defendant’s symptoms and his mental defect at the time of the offense, the defendant was not able to distinguish the difference between
 
 *674
 
 right and wrong. She replied in the affirmative.
 

 Dr. Deland conceded on cross examination that the defendant having had sex with street people on a regular basis could have made him suspect that he had a 17sexually transmitted disease. But, she noted that the defendant believed it even after being told several times that he did not have any such disease. She conceded that marijuana was detected in the defendant’s blood at University Hospital two to three hours after he was arrested for the crime. However, Dr. Deland stated that it was her opinion the defendant had a psychotic disorder in addition to using any illegal substances. Dr. Deland conceded that the defendant could have been depressed and suicidal because of what he did to his mother. She also conceded that drugs, anger, rage, or revenge could cause someone to behave in a violent manner. Dr. Deland was asked about the defendant reportedly crying during the killing of his mother, and whether that indicated knowledge, intent or awareness. She said that was possible.
 

 Dr. Deland confirmed on cross examination that blood tests done on the defendant at University Hospital after his arrest showed no barbiturates, phenosodiapans, cocaine, opiates, amphetamines or and PCP. Dr. Deland was questioned on redirect examination about the effect of a marijuana cigarette laced with formaldehyde (embalming fluid), and she conceded that its effects would be about the same as PCP — a short-term break with reality and psychotic symptoms, problems with perception, extreme paranoia and agitation and violence.
 

 Before Richard Richoux, M.D. and Ralph Salcedo, M.D. — the two physicians composing the court-ordered sanity commission testified — defense counsel objected to both them testimony and them report on the ground that he did not receive then-report until the first day of trial. The trial coui-t denied the motion, noting testimony that the delay was caused by the delay in the delivery of defense expert Dr. Deiand’s report.
 

 | ¡^Forensic psychiatrist Dr. Richoux testified that he and Dr. Salcedo first examined defendant on February 7, 2008, to determine his competency to proceed. They examined him on May 8, 2008, to determine his state of mind at the time of the offense. Dr. Richoux identified two reports by himself and Dr. Salcedo, one addressing the defendant’s competency to proceed and the other addressing the defendant’s state of mind at the time of the offense.
 

 As to the defendant’s competency to proceed and assist with his defense, Drs. Richoux and Salcedo found no evidence that defendant was suffering from any clear-cut mental disorder. They ruled out a psychotic disorder, noting that at the time they examined him he was on anti-psychotic medication. Dr. Richoux said either there had been psychotic symptoms and they were being controlled or had been put into remission with the medication, or there had been no psychotic symptoms to begin with. The doctors also included marijuana and cocaine use in their diagnostic impressions, with institutional remission, meaning that because the defendant was institutionalized he presumably could not get drugs and was not using them. The doctors found the defendant demonstrated a clear understanding of the legal proceedings.
 

 As to the issue of sanity at the time of the commission of the offense, Drs. Ri-choux and Salcedo reviewed the defendant’s rap sheet, New Orleans Police Department records, the defendant’s medical records from Orleans Parish Prison and Delgado Clinic, and the report by defense
 
 *675
 
 expert Dr. Sara Deland. Dr. Richoux said there were some inconsistencies between what the defendant told them during the first examination and the second examination, indicating some untruthfulness on the part of the defendant. Dr. Richoux noted that the police report stated that the defendant’s brother Earl had essentially reported that when he ^dropped their mother off at defendant’s trailer at 11:00 p.m., approximately five hours before the murder, the defendant was in good spirits and showed no signs of being distraught in any way. He said this time frame was of great significance in determining the defendant’s state of mind at the time of the offense. Dr. Richoux said that if an individual develops psychotic symptoms within a period of five hours, the vast majority of the time that does not have to do with a mental illness, but drug intoxication. He said that typical forms of mental illness such as schizophrenia and other forms of psychoses that have nothing to with drugs develop much more gradually over a period of time. Dr. Richoux stated that one possibility was that the defendant was in a rage — nothing to do with psychoses. Dr. Richoux stated that the defendant did not begin taking anti-psychotic medication after killing his mother until he had been in Parish Prison for two months. He noted several notes by psychiatric staff at the prison indicating no evidence of psychoses during that period of time.
 

 Dr. Richoux was shown a medical record from Parish Prison that reflected “chronic illness, psychoses, NOS.” He said “NOS” meant “psychoses not otherwise specified.”
 
 Id.
 
 This meant that the writer believed the defendant had psychoses, but did not know from what cause. Dr. Richoux said the defendant was placed in five-point restraints within a few days after his incarceration because he was voicing suicidal thoughts. Dr. Richoux listed a number of drugs he said have the ability to produce psychotic symptoms: LSD, PCP, ecstasy, marijuana cigarettes dipped in formaldehyde, and sometimes cocaine. He was aware that there was no detectible level of PCP, barbiturates, penzadiapines, cocaine, opiates or amphetamines in his system at the time of the crime. He noted that there was marijuana in the defendant’s system, but admitted that marijuana by itself |1()generally would not lead one to engage in the activity the defendant allegedly engaged in. Dr. Richoux admitted he did not see the defendant prior to him beginning to take anti-psychotic drugs.
 

 Drs. Richoux and Salcedo did the examinations of the defendant together, and the exams lasted approximately forty minutes. Dr. Richoux said that he did not interview any of the defendant’s family members nor anyone else who might have had an opportunity to observe the defendant. He also said that he had read in other documents that the defendant’s brother Earl had taken him to the hospital the night before the killing because the defendant was hearing voices and feeling a tingling all over his body. Dr. Richoux said it was “extremely, extremely unlikely” that that night before the killing was the beginning of a schizophrenic incident. Dr. Richoux also said that as best as he could determine, the defendant apparently was taking the anti-psychotic medication from at least June 2007 until May 2008, when he and Dr. Salcedo examined the defendant for sanity at the time of the offense.
 

 On redirect examination Dr. Richoux spoke about a marijuana cigarette laced with formaldehyde, called a “clickum.” He said the defendant was not tested for the presence of formaldehyde, and he was not sure if it could be tested for in any reliable way. He stated that a clickum frequently produces psychotic symptoms, and that he had seen at least one hundred people psychotic as a result of smoking clickums.
 
 *676
 
 Commenting on the defendant’s reported crying during the time of the offense, Dr. Richoux stated that could be an implication that this person is upset by his actions and therefore probably understands that what he is doing or did was wrong. He disagreed with Dr. Deland’s conclusion that there was a functional mental illness that caused the defendant to be insane at the time of the offense. It was stipulated that if Dr. Salcedo, an expert forensic psychologist, were [^called to testify his opinions and testimony would be consistent with Dr. Richoux’s.
 

 ERRORS PATENT
 

 A review of the record reveals no patent errors.
 

 ASSIGNMENT OF ERROR NO. 1
 

 In his first assignment of error, the defendant argues that the evidence was insufficient to sustain the defendant’s conviction, in that viewing all the evidence in a light most favorable to the prosecution, no rational trier of fact could conclude beyond a reasonable doubt that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense.
 

 This Court set forth the applicable law on the insanity defense in
 
 State v. Currie,
 
 2000-2284 (La.App. 4 Cir. 2/13/02), 812 So.2d 128, as follows:
 

 In Louisiana, a legal presumption exists that a defendant is sane at the time of the offenses. La. R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, defendant must show he suffered a mental disease or mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14;
 
 State v. Williams,
 
 346 So.2d 181 (La.1977). The determination of sanity is a factual matter. All the evidence, including expert and lay testimony, along with the defendant’s conduct and action, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense.
 
 State v. Bibb,
 
 626 So.2d 913 (La.App. 5th Cir.1993),
 
 writ denied,
 
 93-3127 (La.9/16/94); 642 So.2d 188;
 
 State v. Claibon,
 
 395 So.2d 770 (La.1981). Lay testimony pertaining to defendant’s actions, both before and after the crime, may provide the fact finder with a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense.
 
 State v. Peters, supra,
 
 94-0283 (La.10/17/94); 643 So.2d 1222;
 
 State v. Claibon, supra.
 

 In reviewing a claim for insufficiency of evidence in an action where an affirmative defense of insanity is raised, this court, applying 112the standard set forth in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense.
 
 State v. Peters,
 
 94-0283 (La.10/17/94); 643 So.2d 1222;
 
 State v. Nealy,
 
 450 So.2d 634 (La.1984);
 
 State v. Price,
 
 403 So.2d 660 (La.1981);
 
 State v. Claibon, supra; State v. Roy,
 
 395 So.2d 664 (La.1981).
 

 Currie,
 
 2000-2284, pp. 16-17, 812 So.2d at 137-138, quoting
 
 State v. Silman,
 
 95-0154, p. 7 (La.11/27/95), 663 So.2d 27, 32.
 

 
 *677
 
 The following rules also apply in accessing the sufficiency of the evidence:
 

 A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses.
 
 State v. Silman,
 
 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the fact finding function of the jury only to the extent necessary to assure the Jackson standard of review.
 
 State v. Bordenave,
 
 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence.
 
 Id.
 

 State v. Macon,
 
 2006-481, pp. 7-8 (La.6/1/07), 957 So.2d 1280, 1285-1286.
 

 The defendant does not dispute that the two members of the sanity commission appointed by the trial court, forensic psychiatrist Dr. Richard Richoux and forensic psychologist Dr. Ralph Salcedo, found no evidence of any mental disease or defect that prevented the defendant from distinguishing between right and wrong with regard to defendant’s killing of his mother. The defendant’s expert witness, forensic psychiatrist Dr. Sara Deland, answered in the affirmative when asked during direct examination whether, with reasonable medical certainty, because of the defendant’s symptoms and his mental defect at the time of the offense, he was not able to distinguish the difference between right from wrong. Dr. Richoux — and Dr. Salce-do, by the effect of defense counsel’s stipulation to his testimony — disagreed with Dr. Deland on this point.
 

 | iSThe defendant’s argument in this assignment of error is essentially directed to bolstering the weight of Dr. Deland’s expert testimony and her credibility, while attacking the weight of the testimony by Drs. Richoux and Salcedo and attempting to undercut their credibility. However, viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense.
 

 There is no merit to this assignment of error.
 

 ASSIGNMENT OF ERROR NO. 2
 

 In his second assignment of error, the defendant argues that the trial court erred in refusing to permit Earl Truvia, the defendant’s brother, to testify about the defendant’s demeanor on the night of the incident, thus violating his right to present a defense.
 

 During the direct examination of Earl Truvia, defense counsel asked:
 

 Let me ask you, when you left at about eleven o’clock the night before your mother’s death, did Gregory at that point [sic] was his demeanor [sic] or was there anything about him that seemed unusual or strange?
 

 The prosecutor objected. Defense counsel stated “That he observed,” meaning what Earl Truvia had observed.
 
 Id.
 
 The trial court then sustained the objection. There was no valid ground for the objection. Earl Truvia had already testified without objection to defendant’s behavioral changes when he moved into the trailer, and to specific instances of defendant’s behavior. The testimony sought would have been relevant to the issue of defendant’s state of mind at the time of the offense. It would not have constituted hearsay. It would have been permissible opinion testimony by a lay witness that was rationally based on the perception of [ 14the witness and helpful to a clear understanding of the determination of fact in issue. La. C.E. art. 701.
 

 
 *678
 
 During the prosecutor’s cross examination of Earl Truvia, moments after the foregoing objection by the State was sustained, the following colloquy occurred with regard to the witness’s testimony on direct examination about his concern for the defendant’s behavior after he moved into the trailer:
 

 Q But you weren’t concerned enough? In other words, you left him alone with your mother. So, you weren’t concerned enough to make sure that he was okay ?
 

 A The concern was when I left him. I stayed with him a period of time where he told me he was okay. So, that duration that I spent with him, that was enough for me to have the concern that he -was okay.
 

 In addition, the expert opinions of Dr. Richoux and Dr. Salcedo took into account what Earl Truvia said to police after the killing, with Dr. Richoux relating that Earl told police that the defendant was in good spirits and showed no sign of being distraught in any way.
 

 A criminal defendant has the constitutional right to present a defense. U.S. Const. Amend. 6; La. Const. Art. 1 § 16;
 
 Washington v. Texas,
 
 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967);
 
 State v. Van Winkle,
 
 94-0947, p. 5 (La.6/30/95), 658 So.2d 198, 201. “It is difficult to imagine rights more inextricably linked to our concept of a fair trial [than the right to present a defense].”
 
 Van Winkle,
 
 94-0947, p. 5, 658 So.2d at 202. Evidentiary rules may not supersede a defendant’s fundamental right to present a defense.
 
 Id.; State v. Thompson,
 
 2008-0874, p. 4 (La.App. 4 Cir. 4/8/09), 10 So.3d 851, 853. Nevertheless, confrontation errors are subject to the harmless error analysis.
 
 Thompson,
 
 2008-0874, p. 4, 10 So.3d at 853, citing
 
 State v. Broadway,
 
 96-2659, p. 24 (La.10/19/99), 753 So.2d 801, 817. In a harmless error review, “the question is not whether, in a trial that | lsoccurred without error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.”
 
 State v. Vance,
 
 2003-1946, p. 10 (La.App. 4 Cir. 6/30/04), 879 So.2d 862, 869, citing
 
 State v. Johnson,
 
 94-1379, p. 14 (La.11/27/95), 664 So.2d 94, 100.
 

 Defense counsel’s question to Earl Tru-via was whether Earl had noticed “anything about [defendant] that seemed unusual or strange” when Earl left defendant and their mother at 11:00 p.m. on the night before the early-morning killing. Moments after that question, Earl essentially testified on cross examination that defendant was okay when he left him; it is not disputed that Earl left him at approximately 11:00 p.m. This testimony by Earl vras consistent with what he told police after the killing, described by Dr. Richoux as that Earl felt the defendant was in good spirits and showed no sign of being distraught in any way. Dr. Richoux testified that he expressly relied on what Earl Tru-via said to police after the killing in reaching his conclusion, and that what Earl had said was very important to his conclusion that the defendant was not insane at the time of the offense. Dr. Richoux testified that if an individual develops psychotic symptoms within a period of five hours, the vast majority of the time that does not have to do with a mental illness, but drug intoxication.
 

 While it is not known exactly what Earl Truvia would have testified to in answer to defense counsel’s question which was objected to by the prosecutor, even if he had answered that he noticed something strange or unusual when he left defendant at
 
 11:00
 
 p.m., that would have been inconsistent with his subsequent testimony on cross examination that defendant was okay
 
 *679
 
 when he left him. It would also have been inconsistent with his statement to police after the killing.
 

 11(iIt can be noted that defense counsel failed to proffer what Earl Truvia’s answer might have been to the question objected to by the State. Nor does the defendant suggest in his appellate brief what Earl Truvia might have said in answer to that question.
 

 Considering all of the facts and circumstances, the guilty verdict rendered in this case was surely unattributable to any error by the trial court in sustaining the State’s objection at issue here. Therefore, any error by the trial court in sustaining the objection was harmless error.
 

 There is no merit to this assignment of error.
 

 ASSIGNMENT OF ERROR NO. 3
 

 In his third assignment of error, the defendant argues that the trial court erred in denying his motion to continue the trial, such motion being made on the first day of trial.
 

 Defense counsel moved for a continuance in writing on the first day of trial wdien he had not received a copy of the sanity report by the members of the court-appointed sanity commission, Dr. Richoux and Dr. Salcedo. The trial court pointed out that the defendant’s prior defense counsel had requested that Drs. Richoux and Salcedo defer their sanity report until after they had read the report by defense expert Dr. Sara Deland, and that the defense kept putting off the production of Dr. Deland’s report. That delayed Drs. Richoux and Salcedo completing their report. Thus, the trial court denied the motion to continue. Defense counsel received the report by Drs. Richoux and Salcedo later during the first day of trial. Dr. Richoux was the last witness to testify at the trial, on the second day of the trial. Dr. Salcedo did not actually testify, but instead defense counsel stipulated to his testimony after Dr. Richoux testified.
 

 117La.C.Cr.P. art. 645(B) states that the report of the sanity commission “shall be” be filed within thirty days of after the order of appointment. However, “[t]he time for filing may be extended by the court.”
 
 Id.
 

 A trial court’s decision to deny or grant a continuance is within its broad discretion and will not be disturbed absent a clear showing of abuse; the decision depends on the circumstances of each case and should not be disturbed absent a showing of specific prejudice.
 
 State v. Randle,
 
 98-1670, p. 8 (La.App. 4 Cir. 12/22/99), 750 So.2d 353, 358.
 

 The defendant shows no prejudice from the denial of his trial counsel’s motion to continue. Defense counsel received the sanity commission report the day before Dr. Richoux, a member of the sanity commission, testified at trial. Defense counsel’s cross examination of Dr. Richoux was not lacking. It is not disputed by the defendant that the trial court correctly stated that the defendant’s prior counsel had requested that the sanity commission members delay preparation of their report until they read Dr. Deland’s report, or that defense counsel delayed producing Dr. De-land’s report.
 

 Considering these facts and circumstances, it cannot be said that the trial court erred in denying defense counsel’s motion to continue.
 

 There is no merit to this assignment of error.
 

 For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
 

 AFFIRMED.